**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
T.C., individually and on behalf of I.M.,

                 Plaintiff,

-against-

William Floyd Union Free School District,

                 Defendant.
------------------------------------------------------------------X

**COMPLAINT**

**ECF CASE No. 2:22-CV-7122**

Plaintiff T.C., individually and on behalf of her daughter, I.M., by her attorney, Thivierge & Rothberg, P.C., as and for her Complaint, hereby alleges and states the following:

## PRELIMINARY STATEMENT

1. Plaintiff T.C., individually and on behalf of her child, I.M., brings this action pursuant to the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, the pertinent implementing regulations promulgated under the Code of Federal Regulations, § 300.342, *et seq.*, Article 89 of the New York State Education Law, Section 504 of the Rehabilitation Act of 1973, and Part 200, *et seq.*, of the Commissioner of Education's Regulations, against the Board of Education of the William Floyd Union Free School District ("The District").

2. Plaintiffs seek review and reversal of State Review Officer ("SRO") Steven Krolak's decision dated August 26, 2022[1] ("SRO Decision"), which reversed Impartial Hearing Officer ("IHO") Jerome D. Schad's Decision & Order (On the Merits) dated June 15, 2022[2] ("IHO Decision"). The SRO Decision erroneously found that the District offered I.M. a

---

[1] A true copy of the SRO Decision, *Application of the Board of Education of the William Floyd Union Free School District*, Appeal No. 22-092, is annexed hereto as Exhibit A.
[2] A true copy of the IHO Decision for this matter is annexed hereto as Exhibit B.

free and appropriate public education ("FAPE") for the twelve-month 2021-2022 school year (July 2021 – June 2022), contrary to the well-reasoned IHO Decision.

3. The SRO erred in reversing the IHO's decision in favor of T.C..'s request for full tuition payment of I.M.'s program at the Vincent Smith School ("VSS") for the 2021-2022 school year. The IHO, after presiding over an administrative due process hearing, correctly found that T.C. and I.M. were entitled to tuition funding because the District failed to offer I.M. a FAPE through an individualized education program ("IEP") developed by the District Committee on Special Education ("CSE").

4. While the IHO properly found that the District had failed to address I.M.'s reading deficits properly and sufficiently, the SRO erred in reversing this finding.

5. The SRO also erred in reversing the IHO's finding that the District failed in its obligation to place I.M. in a class composed of peers of similar educational needs as hers.

6. The SRO further erred in reversing the IHO's finding that the District inappropriately recommended Adaptive Physical Education ("APE") for I.M.

7. Moreover, the SRO additionally erred by failing to determine that the District predetermined I.M.'s placement and failed to develop appropriate Goals for her.

8. The SRO also erred in finding that the District's assigned placement in an inappropriately large 15:1:1 special class with a 1:1 aide was appropriate for I.M. I.M. had previously regressed in a 15:1:1 special class size and multiple witnesses familiar with I.M. and her educational needs testified that a 1:1 aide would be inappropriate for her.

**JURISDICTION AND VENUE**

9. This Court, pursuant to 20 U.S.C. § 1415(i)(2)(A), 28 U.S.C. § 1331, and 28 U.S.C. § 1367, has jurisdiction over this action without regards to the amount in controversy.

10. Venue is proper pursuant to 28 U.S.C. § 1394(b) in that plaintiffs and defendant all reside in or are situated within this judicial district.

## THE PARTIES

11. I.M. and her mother, T.C., are not expressly named herein by their given names, or further identified by their actual addresses within the Eastern District of New York, because of privacy guarantees provided in the IDEA, as well as in accordance with the Family Educational Rights Privacy Act ("FERPA"), 20 U.S.C. § 1232(g) and 34 C.F.R. § 99.

12. At all relevant times pertaining to this action, T.C. and I.M. were and are residents of the State of New York in Suffolk County, residing at an address within the boundaries of the District.

13. Defendant, the District, upon information and belief, is a duly constituted school district organized under the laws of the State of New York, and is the agency charged with the obligation to provide I.M. with a FAPE in accordance with IDEA mandates.

## RELIEF BEING SOUGHT

14. Plaintiffs seek a determination that (a) the District failed to provide I.M. with a FAPE for the 2021-2022 school year; (b) I.M.'s placement at the Vincent Smith School was appropriate for her; (c) equitable considerations support I.M. and her mother; (d) the District should fund I.M.'s program at VSS and reimburse T.C. for transportation expenses; and (e) T.C. and I.M. are entitled to any other, further, and different relief the Court deems appropriate under the circumstances.

15. Pursuant to the IDEA and New York State Education Law, all school districts within New York State are required to offer eligible students with disabilities educational programs tailored to meet these students' individual needs, and to provide each such student with a

FAPE through an Individualized Education Program ("IEP"). Parents have separate statutory entitlements that are tied directly to their child's right to receive a FAPE. The FAPE requirements under the IDEA and the New York State Education Law are different for each child, and a "one size fits all" approach is not accepted. *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 859 (6th Cir. 2004).

16.  A District may be ordered to reimburse parents for their expenditures for private educational expenses obtained for a child if the services it offered were inadequate or inappropriate ("Prong I"), the services selected by the parents were appropriate ("Prong II"), and equitable considerations support the parents' claims ("Prong III"). *Sch. Comm. of Burlington v. Dept. of Educ.*, 471 U.S. 359 (1985); *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993).

17.  The Supreme Court has found that Congress intended for such reimbursement to be available as a remedy for parents when the school district failed to offer the student a FAPE. "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance," had the district offered the student a FAPE. *Burlington*, 471 U.S. at 370-71.

18.  Once the *Burlington/Carter* test is met under the IDEA, and a parent shows that his or her financial circumstances eliminate the opportunity for the unilateral placement, the school district must directly pay the cost of the private placement and services immediately. *See Connors v. Mills*, 34 F. Supp. 2d 795, 803-804 (N.D.N.Y. 1998); *see also A.R. v. N.Y. City Dep't of Educ.*, 12 cv 4493 (PAC), 2013 WL 5312537, at *8 (S.D.N.Y. Sept. 23, 2013)(reasoning that it would be a "grave error" to preclude a child from receiving a FAPE because a parent did not have the means to pay for a private placement).

19. In New York State, there is a two-tier administrative due process review. A parent who believes that an IEP is insufficient may challenge it at a hearing before an IHO. 20 U.S.C. § 1415(f); N.Y. Educ. L. § 4404(1)(a). "At that hearing, the school district has the burden of demonstrating the appropriateness of its proposed IEP." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 379 (2d Cir. 2003). The IHO's decision may be appealed to an SRO, which may in turn be challenged in either state or federal court. *Id.* at 380. (citing 20 U.S.C. § 1415(g), (i); N.Y. Educ. L. § 4404(2)); *see also* N.Y. Educ. L. § 4404(1)(c).

20. The District Court "conducts a 'modified de novo' review of the administrative proceedings," and is charged with making an independent decision based on the preponderance of the evidence developed at the administrative proceedings, and any other evidence presented by the parties. *See M.N. v. N.Y. City Dep't. of Educ.*, 700 F.Supp.2d 356, 363-364 (S.I.M.Y. 2010); *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 122-123 (2d Cir. 1998). The Court does not "rubber stamp" administrative decisions, but rather, is expected to give "due weight" to the factual determinations made during the state administrative process. *Walczak,* 142 F.3d at 129; *see Rowley,* 485 U.S. at 206. The Court has "broad authority to grant 'appropriate' relief, including reimbursement for the cost of private special education where a school district fails to provide a FAPE." *Forest Grove School Dist. v. T.A.,* 557 U.S. 230, 239 (2009).

21. In an action involving rights provided by IDEA, the District Court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C); *see M.S. v. N.Y. City Dep't of Educ.,* 231 F.3d 96, 102 (2d Cir. 2000).

**FACTUAL BACKGROUND**

22.     I.M. is a twelve-year-old girl diagnosed as having Attention Deficit Hyperactivity Disorder ("ADHD"), dyslexia, and dysgraphia. Ex. P-12, p. 21; T. 168.   The District classified I.M. as a student with a Learning Disability.  Ex. D-4, p. 1.

23.     The District failed to develop a procedurally and substantively appropriate IEP for I.M., which was calculated to enable her to receive educational benefits, for the 2021-2022 school year.

24.     In 2018, I.M. underwent a neuropsychological evaluation with Dr. Amanda Addolorato Macdonald, Psy.D. I.M. was displaying severe hyperactivity and weaknesses in reading and writing including "extremely poor" decoding skills. Ex. P-2, p. 11. She failed to read any words during the evaluation. *Id*. Dr. Macdonald recommended, *inter alia*, that I.M. be placed in a small, specialized setting with a high teacher-to-student ratio, as well as daily 1:1 or small group academic remediation, particularly in reading where she requires Orton-Gillingham or Wilson Language Training ("Wilson Reading") instruction. Ex. P-2, pp. 12-13.

25.     The District failed to recommend an appropriate placement for I.M. for the 2019-2020 school year, and I.M. began to attend VSS in September 2019. T. 338. When she started school at VSS, I.M. was a nonreader, unable to write a sentence or decode a simple CVC (consonant-vowel-consonant) word. T. 339-40.

26.     An associate of Dr. Macdonald, Dr. David Sukiennik, Psy.D., re-evaluated I.M. during the 2019-2020 school year. Ex. P-3, p. 1. Dr. Sukiennik concluded that I.M. was progressing at VSS and endorsed Dr. Macdonald's recommendations. Ex. P-3, pp. 4-5. He wrote, *inter*

*alia*, that I.M. should be placed in a "specialized and individualized academic setting that provides a structured, yet supportive environment with a smaller student to teacher ratio… [with] exposure to challenging content…[and] placement in a classroom with peers who have commensurate cognitive abilities." Ex. P-3, p. 5.

27. District school psychologist Joshua Zelin evaluated I.M. on February 5, 2021. Ex. D-1, p. 1. Although the District had referred I.M. for a "psychological reevaluation," Mr. Zelin failed to assess I.M.'s social-emotional needs. Ex. D-1, p. 2; T. 237.

28. Mr. Zelin noted that I.M. displayed signs of distraction or anxiety even in a 1:1 testing environment. Ex. D-1, p. 4. In addition, Mr. Zelin noted I.M. had a weakness in her working memory, which caused her to have difficulty concentrating and attending to information. I.M.'s memory deficits were compounded by a weak cognitive efficiency which caused her to struggle with learning new material. Ex. D-1, pp. 9-11.

29. At the District's request, Elaine Micali, MS, Ed. also evaluated I.M., in the areas of decoding, encoding, reading fluency, comprehension, vocabulary. and writing. Ex. D-2, pp. 1-2; T. 198. During the evaluation, conducted on January 12, 2021, Ms. Micali administered the Wilson Assessment of Decoding and Encoding ("WADE") to I.M. even though she was not certified in Wilson Reading. Ex. D-2, p. 3; T. 213, 217.

30. Ms. Micali concluded that I.M. was progressing at VSS and that she continued to require intensive support and intervention to be provided with "ultimate fidelity." Ex. D-2, p. 10. Further, Ms. Micali recommended that I.M. continue to receive "specialized reading instruction utilizing the Wilson Reading System." Ex. D-2, p. 11.

31. The District convened a Committee on Special Education ("CSE") meeting for I.M. on April 19, 2021, to review the new evaluations. Ex. D-4; T. 250. Professionals from VSS

participated in the CSE meeting and provided detailed information about I.M.'s programming and progress. T. 359; Ex. D-4, pp. 9-18.

32. During the meeting, VSS staff registered concerns with Ms. Micali's evaluation results. T. 362. Specifically, Ms. Micali had administered a large number of tests to I.M. during an extended period of time, approximately four hours. T. 362, 476; Ex. D-2, p. 2. Lois Dierlam, VSS Dean of Students, was particularly concerned that I.M.'s reading fatigue negatively impacted her scores on Ms. Micali's evaluation, as they were incongruent with I.M.'s performance at VSS. T. 362-63, 476, 506.

33. At the conclusion of the CSE meeting, the District recommended a 15:1:1 special class program for I.M. Ex. D-4. T.C. and VSS staff expressed their concerns that this class size was too large for I.M. and that I.M. instead required a placement similar to VSS to meet her individual educational needs. The District's staff dismissed these concerns without sufficient discussion and consideration. T. 364, 515, 601.

34. Dr. Malasia Walker, District Director of Special Education, observed I.M. at VSS during the 2020-2021 school year. T. 20, 28. Dr. Walker testified that she failed to record any notes from her observation but that "nothing" stood out in her memory of the observation. T. 28-29. She was able to recall, though, that I.M. was called on frequently and responded to her teacher's questions. T. 29.[3]

35. The District convened an annual review CSE meeting on May 18, 2021, to discuss I.M.'s 2021-2022 IEP. Ex. D-6; T. 253. Dr. Walker participated in this CSE meeting, identified as a "General Education Teacher," while Ravi Seeram, the District's Assistant Director of Special Education, acted as the CSE Chairperson. Ex. D-6, p. 1; T. 40, 52.

---

[3] Additionally, Dr. Walker did not appear to be familiar with VSS, repeatedly misstating the school's name as "Vincent E. Smith." T. 26, 27, 34, 35, 43.

36. VSS staff participated in this CSE meeting and discussed I.M.'s continued progress at VSS in a small class program, with individual occupational therapy ("OT") and research-based individual reading instruction through Wilson Reading and S.P.I.R.E. Ex. D-6, pp. 1, 9-20; T. 34, 556. Victoria Scrimenti, I.M.'s reading teacher at VSS, is certified in Wilson Reading and described I.M.'s Wilson Reading step level. T. 34, 349, 394-95, 452, 514, 556. VSS staff informed the CSE that I.M. continued to require a very small class program with appropriate 1:1 reading instruction, in a program similar to VSS. T. 365-66, 601-02.

37. Despite her progress at VSS, the District refused to consider continuing I.M.'s placement at VSS.

38. Instead, the District recommended that I.M. return to an inappropriately large 15:1:1 special classroom within the District – essentially the same type of program where she had regressed when last placed in-District – with the addition of a 1:1 aide, as well as counseling, OT, and reading instruction. Ex. D-6; T. 365. T.C. and VSS staff familiar with I.M. explained their concerns that this program would be inappropriate for I.M. for several reasons including the fact that the classroom would be too large for her. T. 42, 366, 515 601-02. Additionally, I.M. would be emotionally dysregulated by having an aide with her, and she would regress as a result. T. 366. Once again without sufficient discussion or consideration, the District dismissed the concerns of T.C. and VSS staff familiar with I.M.

39. Following the meeting, T.C. informed the District by email that I.M. would not participate in the District's summer program. T. 603; Ex. P-14.

40. By letter dated August 16, 2021, T.C. wrote to the District expressing concern that I.M. would not be appropriately placed in the District's recommended program. Ex. P-11. T.C. provided timely notice that subject to an appropriate recommendation from the District for

her, I.M. would continue to attend VSS for the 2021-2022 school year, and that under such circumstances T.C. would look to the District for the tuition, costs, and expenses of that program (including all services and transportation). *Id*.

41.     On August 24, 2021, T.C. visited Paca Middle School to learn more about the District's program proposed for I.M. Ex. P-12. T.C. met with Dr. Michele Gode, Paca Middle School Principal, who refused to answer many of T.C.'s questions, including about curricula or where I.M. would receive reading instruction. *Id*.

42.     The location of I.M.'s reading instruction was also unclear on the District's IEP and Prior Written Notice ("PWN"). Location would be an important factor due to I.M.'s need for placement in a non-distracting environment. Exs. D-5, p. 1, D-8, p. 1, P-12, p. 1.

43.     When asked about how much individual instruction I.M. would receive from the *teacher* in the program at Paca Middle School, Dr. Gode indicated that all individual needs would be met by I.M.'s aide (who would not be a special education teacher). Ex. P-12, p. 1. Additionally, Dr. Gode informed T.C. that I.M. would be placed in an 8:1:1 special classroom, which was not the class size recommended in I.M.'s IEP. Ex. P-12, p. 1. Following her visit to Paca Middle School, T.C. wrote to the District, outlining her concerns with the assigned program and placement. Ex. P-12.

44.     After the start of the 2021-2022 school year, the District convened another CSE meeting on September 14, 2021. Ex. D-9. T.C. and staff from VSS participated in the meeting, but the District refused to meaningfully consider any of T.C.'s concerns listed in her letter or from her visit to Paca Middle School. Ex. D-9, P-12.

45.     The District read out sections of T.C.'s letter and rather than collaboratively discuss solutions to her concerns, repeated that the previously developed IEP was appropriate. Ex.

P-12. The District also informed T.C. that I.M.'s individual reading services would be provided outside of school by a District consultant and that her in-school daily group reading instruction would require her to be pulled out of a core academic class daily. Ex. P-12, p. 2. Staff from VSS, along with T.C., expressed their concern and disagreement with the District's proposed program, noting that I.M. would regress in a large class with a 1:1 aide, with significant pull-outs from core classes, and after school reading instruction. T. 375.

46.  By letter dated December 3, 2021, T.C. informed the District that she did not believe that the District's recommended program was appropriate for I.M. Ex. P-12. She raised a number of concerns including that I.M. would not have appropriate peers, based on her individual educational needs; would not receive the reading instruction that she needed in a location designed to promote progress; and would not have her individual needs met by a special education teacher. Ex. P-12. She reiterated that I.M. would continue to attend VSS for the 2021-2022 school year, and she would look to the District for the tuition, costs, and expenses of I.M.'s program (including all services and transportation). *Id.*

47.  Thereafter, the District convened a third CSE meeting on January 18, 2022. Ex. D-10. VSS staff participated in the meeting again and discussed I.M.'s continued progress at VSS. Ex. D-10, pp. 1, 5-10; T. 367. District staff agreed that I.M. had shown gains using Wilson Reading instruction. T. 490.

48.  Mr. Seeram reread T.C.'s December 3, 2021 letter to the District to the CSE and again unilaterally pronounced the reasons why he claimed the District program was appropriate. *See* T. 378. Mr. Seeram confirmed that I'M. could not receive reading instruction during the school day. T. 376-78, 602. The CSE did not have any further discussion of how to

address T.C.'s concerns. T. 378. VSS staff again informed the CSE that I.M. needed a very small class with appropriate 1:1 reading instruction, in a program similar to VSS or at VSS. T. 379. Despite her progress at VSS, the District refused to consider continuing I.M.'s placement at VSS.

49. Absent appropriate recommendations from the District, I.M.'s mother continued I.M.'s enrollment at VSS for the 2021-2022 school year. At VSS, I.M. received instruction in small, supportive classes with appropriate related services, significant teacher support, and specialized reading instruction. I.M. received differentiated instruction tailored to her individual needs. T. 370.

50. The IHO correctly held that the District failed to offer I.M. a FAPE. On the other hand, I.M.'s program at VSS is appropriately tailored to her needs and she has progressed there, and equities favor I.M. and T.C. The IHO properly awarded tuition funding and transportation reimbursement to I.M. and T.C.

## LEGAL CLAIMS

51. The SRO Decision should not be afforded deference as it is not supported by testimony, evidence, or applicable law and review standards. The SRO failed to engage in a thorough and careful review of the testimony and evidence in the record.

52. The SRO Decision does not turn on educational expertise such that deference is warranted. *De novo* review compels a finding that the District denied I.M. a FAPE.

53. The SRO incorrectly dismissed the issue of the District inappropriately recommending adaptive physical education ("APE") to I.M. (SRO Decision, pp. 10-11).

54. The IDEA does not require that parents allege IEP deficiencies detailed in any formulaic manner, and the Second Circuit has held that the waiver rule is not to be mechanically

applied. *F.L. v. Bd. of Educ. of Great Neck U.F.S.D.*, 274 F. Supp. 3d 94, 114 (E.D.N.Y. 2017), *aff'd sub nom. F.L. v. Bd. of Educ. of Great Neck Union Free Sch. Dist.*, 735 F. App'x 38 (2d Cir. 2018)(*citing C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68, 78 (2d Cir. 2014).

55.    Here, T.C. raised the issue of inappropriate related services in the due process complaint, to wit: "The District failed to recommend appropriate related services for [I.M.], including failing to recommend sufficient 1:1 occupational therapy for [I.M.]." Ex. P-1, p. 7 (emphasis added).

56.    The District therefore was aware that T.C. was concerned about the related services offered to I.M. and was not "sandbagged" by this information as the SRO claims. (*See* SRO Decision, p. 10).

57.    The SRO inaccurately claimed that the "district's director of special education…testified that the parent did not outwardly express any negative concerns regarding the May 2021 CSE's recommendations." (SRO Decision, p. 16).

58.    Rather, neither the Director nor the Assistant Director of Special Education in the District could not state whether the CSE discussed T.C.'s concerns. (T. 35, 54, 77-78).

59.    This Court should not afford deference to the SRO's inaccurate holding that the District did not predetermine I.M.'s placement, especially as "[t]he issue of predetermination is not a matter requiring educational expertise." *A.K v. Westhampton Beach Sch. Dist.*, No. 17CV0866GRBSIL, 2021 WL 621236, at *14 (E.D.N.Y. Jan. 6, 2021), *report and recommendation adopted sub nom. Killoran v. Westhampton Beach Sch. Dist.*, No. 2:17-CV-00866, 2021 WL 665277 (E.D.N.Y. Jan. 25, 2021).

60.  A school district's predetermination of a child's IEP can amount to a procedural violation of the IDEA if it deprives the parent of meaningful participation in the IEP development process. *J.G. v. Kiryas Joel Union Free Sch. Dist.*, 777 F. Supp. 2d, 606, 648 (S.D.N.Y. 2011); *see also Deal*, 392 F.3d at 858 (reasoning that an IEP can still be predetermined even when the parents are afforded the opportunity to speak at the CSE meeting, if the school district failed to involve the parents adequately in a collaborative process and consistently rejected parent requests).

61.  If the school district does "not have an open mind" to consider alternative programs or services, the program is predetermined. *T.P. ex rel S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 253 (2d Cir. 2009).

62.  The District's failure to consider program options requested by a parent may constitute predetermination and a denial of FAPE, as it denies a parent meaningful participation in IEP development. *See, e.g., E.H. v. N.Y. City Dep't of Educ.*, 164 F.Supp.3d 539, 552-553 (S.D.N.Y. 2016)(finding that the CSE predetermined a student's placement where it failed to consider more restrictive options at a parent's request). Just as in *E.H.*, the SRO here "effectively cast the Parent's argument as an objection that the CSE did not adopt her opinion, rather than one related to her meaningful participation…[b]ut this conclusion is irrelevant to the proper inquiry." *E.H.*, 164 F. Supp. 3d at 552.

63.  Here, the District made placement decisions based on what it had available rather than on I.M.'s individual needs. For example, the District rejected placement in a class smaller than 15 students for I.M. because it only had 12:1:1 and 8:1:1 special classes for students on a life skills track rather than an academic track. T. 66. A "life skills" class is not appropriate for I.M., who is capable of ambitious academics with appropriate support. *Id.* The District

did not reject smaller class sizes because I.M. was able to learn in a larger group, but instead because it did not have a class with appropriate peers for her. T. 66. The District failed to consider any smaller class size programs with appropriate peers. *See* T. 66.

64. The District also failed to discuss T.C.'s concerns collaboratively. T. 81. For example, when T.C. brought up concerns that Paca Middle School was too large a setting for I.M., Mr. Seeram told her that I.M.'s evaluations recommended only a small class. T. 83. However, this is contrary to the recommendations of experts familiar with I.M. Ex. P-2, pp. 12-13. Further, T.C. had a right to raise any issues she had about the District's recommended program. Mr. Seeram's response dismissed T.C.'s concerns without justification. This failure is even more egregious as Mr. Zelin testified that he also felt concern that I.M. would struggle due to the large size of Paca Middle School. T. 277-78.

65. The IHO and SRO erred when they dismissed the issue of the District's inappropriate Goals for I.M. without justification. The IDEA requires school districts to provide every child with "the chance to meet challenging objectives" that are "appropriately ambitious." *Endrew F.*, 137 S. Ct. at 1000. An IEP must include "a statement of measurable annual goals, including academic and functional goals" designed to meet the needs of the student. *See* 20 U.S.C. § 1414(d)(1)(A).

66. The District's witnesses failed to testify at hearing that its proposed IEP Goals were appropriate for I.M.

67. In fact, several of the Goals recommended for I.M. were inappropriate for her, including several she already had mastered during the 2020-2021 school year. T. 374, 478-84, 558-59, 580; Exs. D-6, pp. 22-24, D-9, pp. 22-24.

68. The first OT Goal, Number 21, involved not mixing up upper- and lower-case letters while

typing. Ex. D-6, p. 24. This Goal was too advanced for I.M.: Ms. Arnott had worked with I.M. on this skill and determined she was not ready to tackle it yet. T. 558, 580. The second OT Goal, Number 22, addressed letter reversals, which is not an issue for I.M. Ex. D-6, p. 24; T. 559. Similarly, I.M. already mastered the pincer grasp and visual motor coordination skills included in the third and fourth OT Goals, Numbers 23 and 24. *Id.*

69. The SRO also erroneously excused the District's failure to recommend a sufficient level of related services in the area of occupational therapy ("OT") for I.M., which contributed to denying her a FAPE. (SRO Decision, p. 24). *See, e.g., P.K. v. N.Y. City Dep't of Educ.*, 526 Fed. Appx. 135, 139 (2d Cir. 2013)(concluding that the student "required substantial related services and greater individualized attention in order to make meaningful progress and receive an educational benefit from her schooling."). In order to provide a FAPE, the District was required to provide special education and related services tailored to meet I.M.'s unique needs. 20 U.S.C. § 1401(9); *Gagliardo*, 489 F.3d at 107.

70. Upon information and belief, the District recommended that I.M. receive both group and individual OT out of an effort to copy I.M.'s programming at VSS to protect itself from litigation. *See* Exs. D-9, D-10. The District's OT evaluation from February 26, 2021 incorrectly stated that I.M. received OT in a group and individually. Ex. D-3, p.1; T. 567-68. In fact, I.M. was receiving two 40-minute individual OT sessions per week at VSS at the time of this evaluation. T. 553, 562; Ex. D-11, p. 7.

71. The April and May 2021 IEPs both reflect that VSS staff told the District that I.M. was receiving individual OT. Exs. D-4, p. 17, D-6, p. 19. I.M.'s occupational therapist testified to the importance of individual OT for I.M., noting that group OT would not be appropriate for her at that time. T. 553, 562.

72. I.M. required individual attention from an occupational therapist to work on keyboarding and computer skills at her own pace, which would be impossible in group OT sessions. T. 553, 562. I.M.'s continued struggles with keyboarding and her distractibility required 1:1 services. T. 557, 578. In addition, I.M. also required longer OT sessions due to her need for movement breaks and transitions, and to address her attentional deficits. T. 553, 557.

73. The SRO erroneously disregarded recommendations from I.M.'s December 2019 evaluation which stated that she required monitoring of her emotional state, reasoning that the evaluation was not raised at the CSE. SRO Decision, p. 26; Ex. P-3, p. 4. However, the District's psychologist reviewed this evaluation before the CSE meeting and his report to the CSE. T. 238, 244.

74. In addition, the SRO inappropriately relied on evidence that I.M. was doing well socially at VSS (where she received appropriate support) to prove that she was succeeding. SRO Decision, p. 27. The District ignored I.M.'s emotional needs and her history of deficits were ignored.

75. Dyslexia, which I.M. has, "increases the risk of anxiety, depression, low self-esteem and peer rejection." *See* "Students with Disabilities Resulting from Dyslexia, Dysgraphia, and Dyscalculia: Questions and Answers, Office of Special Educ. (Aug. 2018, at p. 9, https://www.p12.nysed.gov/specialed/publications/documents/q-and-a-students-with-dyslexia-dysgrahia-dyscalculia.pdf.

76. The District and Mr. Zelin failed to make any effort at monitoring I.M.'s depression and anxiety, as recommended by the December 2019 evaluation.

77. Moreover, Mr. Zelin failed to assess I.M.'s social-emotional development as part of his triannual evaluation of her. T. 237; Ex. D-1. Districts are required to triennially re-evaluate

students in areas including "feelings about self, and social adjustment to school and community environments." 8 N.Y.C.R.R. 200.4 §§ (4), (5)(ii)(b); 8 N.Y.C.R.R. § 200.1(ww)(3)(i)(b).

78. The District's claims that its staff was unaware of I.M.'s emotional issues in need of monitoring are unavailing. The District's own IEPs indicate that I.M. needed support and interventions to address behaviors that impeded her learning. T. 264-65; Exs. D-6, p. 21, D-10, p. 11. In addition, VSS staff informed the District that they were concerned I.M. would regress emotionally and behaviorally if shadowed by a 1:1 aide. T. 366, 375, 480.

79. Districts must conduct a Functional Behavioral Assessment ("FBA"), which provides detailed information about a student's problem behaviors, and develop a Behavior Intervention Plan ("BIP"), which provides strategies to reduce those behaviors, for a student whose behavior impedes his or her learning. *See* 20 U.S.C. § 1414(d)(3)(B)(i); 8 N.Y.C.R.R. § 200.22(a)-(b). "[F]ailure to conduct an adequate FBA is a serious procedural violation because it may prevent the CSE from obtaining necessary information about the student's behaviors, leading to their being addressed in the IEP inadequately or not at all…the sole value of an FBA is to assist in the drafting of the IEP." *R.E.*, 694 F.3d at 190-91.

80. Without an appropriate BIP in place, especially in a significantly larger classroom than she was attending, I.M. would have regressed emotionally, behaviorally, and educationally.

81. Also, I.M. required placement in a smaller classroom to address her distractibility and her intensive academic needs, and the 15:1:1 special class recommended by the District would be too large for her to progress meaningfully. T. 364, 485-86, 558, 563; Exs. D-6, D-9, D-

10. The District's recommendation of a 1:1 aide cannot cure its failure to recommend an appropriate class size for I.M., and was itself problematic.

82. The IHO and SRO incorrectly held that a 15:1:1 class "coupled with supports" such as a 1:1 aide would sufficiently make up for the District's failure to recommend a sufficiently small class for I.M. IHO Decision, p. 21; SRO Decision, pp. 27-30).

83. School districts must "offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Endrew F.,* 137 S. Ct. at 1002.

84. Here, District witnesses failed to explain how a class with 15 students could meet I.M.'s individual and unique needs including specific learning disorders, dyslexia, anxiety, and inattention. This was more than double her class at VSS. The testimony instead focused on placing I.M. in the "least restrictive environment" without regard to what was appropriate for her. *See* T. 62.

85. Professionals who evaluated I.M. and worked with her for years highlighted that I.M. would feel anxious and overwhelmed, and could not learn or focus, in a 15:1:1 special class. Exs. P-2, p.5; P-3, p. 2; T. 364, 366, 434.

86. The District's 15:1:1 special class lacks the level of support and direct interaction that I.M. requires to address her special education needs, including in reading. In *Avaras v. Clarkstown,* the Court reasoned that a 15:1 class setting was inappropriate for a student with dyslexia as it would have precluded the level of direct instruction the student required, and found the class size "antithetical to the Wilson approach." *Avaras,* No. 15 Civ. 2042(NSR), 2017 WL 3037402, at *19 (S.D.N.Y. July 17, 2017). The Court in *Avaras*

ultimately found the class size inconsistent with an offer of FAPE, as the Court should find here. *Id.*

87. I.M. would have regressed in a class size of 15 students, as she had in the past, and the District failed to sustain its burden of proving that I.M. would benefit educationally in its proposed class. After evaluating I.M., Dr. Macdonald had recommended a placement with "the highest teacher-to-student ratio" for her. Ex. P-2, p. 12.

88. I.M. attended a 15:1:1 special class in the District during the 2017-2018 school year, after transferring from a larger class mid-year, and the class was regressive for her. T. 434; *see* Ex. P-3, p. 2. Given I.M.'s significant reading disability and the fact that the material would be increasingly challenging as she got older, it strains credulity to assume that the 15:1:1 special class suddenly would be appropriate for I.M. *See* T. 485-86.

89. Dr. Sukiennik, who evaluated I.M. after she began attending VSS, recommended continued placement in a small class like what VSS offered. Ex. P-2, p. 5. Further, as Ms. Dierlam testified, I.M.'s anxiety and distractibility were too significant for her to focus or learn in a 15:1:1 special class, and she would regress if placed there. T. 364, 366, 434.

90. As the SRO correctly noted, New York State guidance on use of 1:1 aides states that a "goal for all students with disabilities is to promote and maximize independence."[4] SRO Decision, p. 29. The support of a 1:1 aide is a highly restrictive intervention that was not necessary for I.M. in an appropriate-sized class and program. *See* Exs. D-6, D-9, D-10. However, the SRO failed to apply this principle and goal to I.M.'s case. The SRO's finding is not supported by the law, evidence, or testimony, and should be reversed.

91. First, Ms. Micali, the District's expert, did not support the provision of a 1:1 aide for I.M.

---

[4] "Guidelines for Determining a Student with a Disability's Need for a One-to-One Aide," Office of Special Educ. Field Advisory [Jan. 2012], at p. 1, https://www.p12.nysed.gov/specialed/publications/1-1aide-jan2012.pdf.

T. 212.

92. Moreover, at VSS, I.M. did not require the restriction of a 1:1 aide with her during class., It would be restrictive, regressive, and ostracizing to force her into a program where she would struggle and require an aide just because the District did not have an appropriate small class for her. T. 366, 557, 562.

93. An aide is not a replacement for appropriate time spent with direct teacher instruction[5], which is possible in I.M.'s appropriately small classes at VSS. An aide cannot provide the instructional help that I.M. needs in order to understand tasks and complete writing work in class. At VSS, I.M. receives intensive support when needed while still working on improving her independence, which would not be possible with an aide. T. 557. As a result, I.M. has gained skills and confidence. T. 354.

94. Professionals familiar with I.M. testified that she would feel "mortified" by having a 1:1 aide and she would regress due to the negative emotional reaction to feeling different from her peers. T. 366, 375, 480.

95. Additionally, a 1:1 aide would distract I.M. from learning rather than help and overall cannot cure the District's failure to recommend an appropriate class size for her. T. 484-85.

96. The District also failed to make clear or appropriate recommendations for specialized reading instruction in I.M.'s IEPs, despite I.M.'s pressing challenges with reading. The District recommended that reading services in an unspecified "Special Location," including a 5:1 group reading session, and failed to recommend services provided by a Wilson Reading certified instructor. Exs. D-4, D-6, D-9, D-10.

---

[5] "Guidelines for Determining a Student with a Disability's Need for a One-to-One Aide," at p. 1.

97.  The SRO correctly identified that the District failed to identify the location where I.M.'s reading instruction would be provided but incorrectly failed to find that this was a denial of FAPE. SRO Decision, p. 32 (referencing "Guide to Quality Individualized Education Program (IEP) Development and Implementation," Office of Special Educ. Mem. (Dec. 2010),

https:www.p12.nysed.gov/specialed/publications/iepguidance/IEPguideDec2010.pdf at p. 43)).

98.  Also, New York State guidance also requires that the location of related services be provided in a student's least restrictive setting, which was during I.M.'s school day. See id. at p. 44.

99.  As the IHO correctly found, the District failed to recommend an appropriate level of reading services for I.M. during the school day. IHO Decision, p. 20; Exs. D-4, p. 10; D-6, p. 10; D-9, p. 10; D-10, p. 7. The District's PWNs and witness testimony stated that I.M.'s individual reading services would be provided in the home, after school. T. 293, 306; Exs. D-5, D-8.

100.  At hearing, the District was unable to explain where or when I.M. would receive specialized reading instruction. Mr. Seeram testified that the District recommended that I.M. receive specialized reading instruction in a "Special Location" so that the provider could choose to provide the service in the classroom or a therapy room and claimed the exact location was not decided. T. 73-75; Ex. 6. p. 25.

101.  It would be inappropriate to not to reach a decision about this crucial programming issue before the start of the school year. Moreover, the PWNs dated 5/18/21 and 9/14/21 - which state that I.M. would receive "specialized reading 1xindividualxdaily at home" – directly

contradict Mr. Seeram's claim. Exs. D-5, p. 1, D-8, p. 1. Also, Dr. Walker testified that I.M. would receive reading instruction after school, at home via Da Vinci Collaborative, because the District feels it "extremely important" that students attend core classes during the school day and therefore they "bring Da Vinci in sometimes after school." T. 35. By its own admission, the District was incapable of providing I.M. an appropriate program to meet her needs within the bounds of a regular school day.

102. The District also informed T.C. that I.M.'s group specialized reading services would require I.M. to be pulled out of core classes during the school day. Ex. P-12, pp. 1-2.

103. The SRO seemingly relied on the United States Department of Education's Office of Special Education Department's ("OSEP") Letter to Irby to argue it was reasonable for the District to recommend reading instruction at home for I.M.. See SRO Decision, pp. 31-32 (referencing 55 IDELR 231 [OSEP 2010]). The SRO appears to suggest that because there are some circumstances where providing reading services during an extended school day may be appropriate, that it is presumptively appropriate for I.M. See SRO Decision, pp. 31-32. The SRO's argument is unavailing. Extended school day instruction would not be appropriate for I.M., taking into consideration her unique needs.

104. District and Plaintiff witnesses agreed that I.M. struggles with reading and "fatigues easily." Ex. D-2, pp. 9, 11; T. 200, 361, 506-07, 524-25. As I.M.'s reading teacher at VSS testified, I.M. became fatigued and less available for learning at the end of a regular school day, and an additional hour of reading instruction after school would be inappropriate for her. T. 507. In that respect, extensive after school instruction in her most difficult subject would be exhausting, inappropriate, and counterproductive for I.M. T. 361, 368, 524-25.

105. The SRO incorrectly claimed that there was "no indication" that concerns regarding I.M.'s reading fatigue were communicated to the District. SRO Decision, p. 33. In fact, the District considered and discussed Ms. Micali's report, which expressed concerns about I.M.'s reading fatigue, at the CSE meetings. *See* Exs. D-2, D-5, p. 2, D-6 p.1.

106. The SRO inappropriately credited Mr. Seeram's testimony that the District had not made a final decision as to the location of I.M.'s reading services (despite the District's responsibility to make clear educational recommendations before the start of the school year). SRO Decision, p. 32; T. 73-75; Ex. D-6. p. 25.

107. The IHO implicitly determined that Mr. Seeram's testimony regarding when I.M. would receive reading services was not credible by holding that there was "no doubt that the members of the CSE and the Parent understood that the proposed IEP contemplated specialized reading instruction outside of the school day." IHO Decision, p. 20.

108. The IHO's credibility determination against Mr. Seeram should stand. Generally, an SRO should defer to the IHO's credibility findings, unless non-testimonial evidence in the hearing record or the hearing record, read in its entirety, compels a contrary conclusion. *See M.W. v. N. Y. City Dep't of Educ.*, 869 F. Supp. 2d 320, 330 (E.D.N.Y. 2012), *aff'd*, 725 F.3d 131 (2d Cir. 2013) (*citing Carlisle Area Sch. v. Scott P.,* 62 F.3d 520, 529 (3d Cir.1995)). "[I]mplicit credibility assessments' are as entitled to deference... as explicit findings." *A.B. v. Lawson*, 354 F.3d 315, 327-28 (4th Cir 2004).

109. The District's own expert contradicts its recommendation that I.M. receive reading services after school. Mr. Zelin "strongly recommend[ed]" that I.M. participate in extracurricular activities outside of school. Ex. D-1, p. 13. This would be impossible if I.M. were receiving daily reading instruction after school.

110. The IHO also correctly held that the District provided "unclear" information regarding whether it could provide Wilson Reading instruction with certified instructors for I.M.'s group reading services. "[T]he school district bears the burden of showing that the proposed placement school has the capacity to implement the child's IEP." *W.W. v. N.Y. City Dep't of Educ.*, 160 F.Supp.3d 618, 627 (2016)(*citing M.O. v. N.Y. City Dep't of Educ.*, 793 F.3d 236, 245 (2d Cir.2015)).

111. Although the District was not required to recommend a specific methodology on its IEP, it made such a recommendation by developing Goals designed to be addressed by Wilson Reading methodology. T. 70, 312. When "a remedial service is included in the individualized education program, such service shall be provided by appropriately certified or licensed individuals." 8 N.Y.C.R.R. 200.6(b)(1).

112. The consultant provider who would have provided the group reading instruction, Michelle Alp, lacked the necessary qualifications to provide Wilson Reading instruction in a group. T. 158, 173, 196. Ms. Alp had Level 1 certification in Wilson Reading, which allowed her to provide 1:1 reading instruction following the Wilson Reading methodology. T. 156, 173, 176, 179. To provide this instruction for a group, a provider needs Level 2 Wilson Reading certification. T. 156. In addition, the District's 15:1:1 special classroom teacher, Madeline Egan, testified that she would be partly responsible for implementing what the Respondents' attorney identified as "Wilson Goals" for I.M. T. 312. Ms. Egan is not certified in Wilson Reading, nor did anyone certified in Wilson Reading supervise her work. T. 311-12.

113. It was also unclear whether the District would have provided I.M.'s group reading during the school day. Ms. Egan testified that none of her students received pull-out group specialized reading. T. 293, 310-11.

114. The SRO's citation to *J.M.G. v. Depew Union Free School Dist.*, 2012 WL 5473491 (W.D.N.Y. 2012), was inapposite. SRO Decision, p. 34. In *J.M.G.*, the parents made a vague claim that District staff lacked proficiency in reading instruction as a general subject matter. 2012 WL 5473491, at *11. Here, the District and T.C. agreed on a specific reading methodology for I.M., and it is uncontested that the District staff who would be implementing that methodology are not appropriately certified to provide the instruction.

115. School districts do not have "carte blanche" to assign placements "that cannot satisfy the IEP's requirements," *T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 420 (2d Cir. 2009). Claims regarding an assigned school's ability to implement an IEP may be non-speculative when they consist of "prospective challenges to [the proposed school's] capacity to provide the services mandated by the IEP." *M.O. v. New York City Dep't of Educ.*, 793 F.3d 236, 245 (2d Cir. 2015). When the proposed school is either "factually incapable" of implementing the student's IEP or the placement must reflect "plans to contravene the IEP," the District has failed to offer a FAPE. *K.C. v. New York City Dep't of Educ.*, 2015 WL 1808602, at *12 (S.D.N.Y. Apr. 9, 2015)(*citing D.C.*, 950 F.Supp.2d at 510–12 and *Scott*, 6 F.Supp.3d at 444–45). Here, District witnesses acknowledged lacking the necessary certification to provide group Wilson Reading instruction to I.M. (*See supra.*)

116. Given the severity of I.M.'s dyslexia, the District's failure to recommend appropriate specialized reading services in her 2021-2022 IEPs amounts to a clear FAPE denial.

117. It was the universal conclusion of all parties, including the District, that I.M. required Wilson Reading instruction. The District lacked any justification for failing to recommend that I.M. receive Wilson Reading in school and additionally failing to recommend or provide a Wilson Reading certified instructor to work with I.M. individually and in a group. *See, e.g.*, Exs. P-2, P-3, D-2. *See Application of the Board of Education*, Appeal No. 20-073 (awarding compensatory reading specialist services where the District failed, *inter alia*, to recommend specialized reading services on a student's IEP).

118. Furthermore, the District was incapable of providing I.M. an appropriate program to meet her needs within the bounds of a regular school day, and she would not be able to meaningfully access instruction provided after school. On the other hand, as explained at the IEP meetings, at VSS, I.M. had multiple class periods of reading throughout her week including 1:1 Wilson Reading with an instructor employed by VSS.

119. The SRO disregarded evidence concerning the inappropriate peers and lack of information provided to T.C. regarding the District's proposed class profile. SRO Decision, pp. 34-37. As the IHO correctly noted, the District did not provide T.C. with information about the proposed classroom peers for I.M. "at the time of the [CSE] meeting." IHO Decision, p. 21.

120. School districts must place students with disabilities in classes with peers of "similar individual needs," sometimes known as "functional grouping." SRO Decision, p. 36. 8 N.Y.C.R.R. § 200.6(h)*; see J.F. v. N.Y. City Dep't of Educ.*, 2013 WL 1803983, at *2 (S.D.N.Y. Apr. 24, 2013)(upholding a parental challenge to a classroom based on students' profiles).

121. Here, as noted by the IHO, even the District's own expert Ms. Micali testified that she was concerned about the 15:1:1 special class placement for I.M., due to lack of information about the proposed class group. IHO Decision, p. 21; T. 206-07. Ms. Micali testified that she shared her concern that a 15:1:1 special class was not appropriate for I.M. as the peers in the 15:1:1 class would not be appropriate for her socially or cognitively. T. 207; Ex. D-4.

122. Claims by District witnesses familiar with I.M. that the other students in the classroom would be appropriate are belied by their lack of knowledge of the profile of the students who would be in the class proposed for I.M. as well as their lack of experience working in Paca Middle School. T. 270-71; IHO Decision, p. 21.

123. The IHO properly determined that "District witnesses lacked knowledge of the class profile in the Paca Middle School" proposed placement. IHO Decision, p. 21. As noted, *supra*, the IHO's implicit determination on witness credibility is entitled to deference. *M.W.*, 869 F. Supp. 2d at 330; *A.B.*, 354 F.3d at 327-28.

124. The SRO erred in relying on testimony from the Paca Middle School Principal which suggested that the class profile was an appropriate match for I.M. SRO Decision, p. 36. The Principal's testimony is retrospective as she was not at the May CSE meeting when the placement recommendation was made. *See* T. 124. "[A]n IEP must be evaluated prospectively as of the time it was created." *See R.E. v. N.Y. City Dep't of Educ.*, 694 F.3d 167, 185-88 (2d Cir. 2012). Further, during T.C.'s visit to the proposed program, the Principal did not appear to be familiar with I.M.'s needs or IEP recommendations, erroneously stating that I.M. was recommended for a 8:1:1 class size. Ex. P-12, p. 1.

125. Further, the SRO erred by ruling that a parent's objections to a class grouping are "inherently speculative" when a student has not attended the proposed program. SRO Decision, pp. 36-37. Courts in the Second Circuit have found that "concerns regarding access to… functional grouping were not speculative." *See J.S. v. New York City Dep't of Educ.*, 104 F. Supp. 3d 392, 413 (S.D.N.Y. 2015), *aff'd*, 648 F. App'x 96 (2d Cir. 2016) (*citing K.R. ex rel. Matthew R. v. New York City Dep't of Educ.,* 107 F. Supp. 3d 295, 311 (S.D.N.Y. 2015).

126. The District tried to fit I.M. into its class rather than tailor her programming to her needs, and the SRO erred by dismissing the District witnesses' lack of information about functional grouping, especially in light of Ms. Micali's testimony that I.M. would not have a proper functional group at Paca Middle School.

127. The SRO erred by ignoring and/or glossing over the significant testimony and evidence demonstrating that the District's proposed IEP and program recommendations would not have been appropriate for I.M., and should be reversed.

128. The SRO erroneously found that the District's IEP was appropriate for I.M. even though it failed to recommend an appropriate class placement or appropriate reading services, and should be reversed.

129. The SRO erred by ignoring and/or glossing over the testimony and evidence demonstrating that the professionals who evaluated I.M. and worked with her had recommended that she be placed in a small class program with appropriate reading services, and should be reversed.

130. The SRO erred by improperly finding that the Goals and Objectives in the District's proposed IEP would have been appropriate for I.M., and should be reversed.

131. The SRO erred by ignoring and/or glossing over the testimony and evidence that the District failed to conduct an FBA and BIP for I.M., and should be reversed.

132. The SRO erred by ignoring and/or glossing over the testimony and evidence demonstrating that the District's recommended 15:1:1 special class program was insufficiently intensive for I.M.'s needs and would cause her to regress, and should be reversed.

133. The SRO erred by overturning implicit credibility determinations made by the IHO, and should be reversed.

134. Overall, the SRO failed to issue a careful and thorough decision, and thus, it is respectfully submitted that this Court should not defer to the SRO's improper determinations.

135. The record as a whole demonstrates that Plaintiff has met the Prong II burden for tuition reimbursement/funding as VSS offered I.M. instruction and supports tailored to her unique needs, and that I.M. progressed meaningfully at VSS, as the IHO properly found.

136. The record as whole demonstrated Plaintiff cooperated with the District such that equities weight in T.C. and I.M.'s favor.

## RELIEF SOUGHT

**WHEREFORE,** Plaintiff respectfully requests that this Court:

(a) reverse the August 26, 2022, SRO Decision it its entirety;

(b) affirm the June 15, 2022, IHO Decision in its entirety;

(c) declare that the District denied I.M. a FAPE for the 2021-2022 school year; that I.M.'s mother has met the applicable Second Circuit standards for funding of unilaterally provided tuition and special education services for I.M. for the 2021-2022 school year; and that the equities favor I.M. and her mother;

(d)     order the District to directly fund I.M.'s program at the Vincent Smith School for

the 2021-2022 school year;

(e)     order the District to reimburse T.C. for the costs and expenses of providing I.M.

with transportation to and from the Vincent Smith School for the 2021-2022

school year;

(f)     declare I.M. and her mother to be the "prevailing party" for purposes of the

IDEA's fee-shifting provision;

(g)     grant leave to Plaintiff's counsel to submit a fee application for purposes of

statutory attorneys' fees and other recoverable costs at the administrative

impartial hearing level, the SRO level, and in this action, pursuant to the IDEA's

fee-shifting provisions; and

(h)     grant Plaintiff such other, further, and different relief as may be just under the

circumstances.


Dated: Huntington, New York
      November 22, 2022

Christina D. Thivierge (CT 9565)
Thivierge & Rothberg, P.C.
Attorneys for the Plaintiff
22 High Street
Huntington, New York 11743
Tel: (212) 397-6360
Fax: (212) 397-6361
*christina@trspecialedlaw.com*