UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------x
T.C. on behalf of I.M.,

                    Plaintiff,          MEMORANDUM & ORDER
                                        No. 22-CV-7122(JS)(JMW)

     -against-

WILLIAM FLOYD UNION FREE
SCHOOL DISTRICT,

                    Defendant.
---------------------------------x
Appearances:

For Plaintiff:      Christina D. Thivierge, Esq.
                    Thivierge & Rothberg, P.C.
                    22 High Street
                    Huntington, New York  11743

For Defendant:      Lakshmi S. Mergeche, Esq.
                    Shaw, Perelson, May & Lambert, LLP
                    21 Van Wagner Road
                    Poughkeepsie, New York  12603


SEYBERT, District Judge:

          By this action, brought pursuant to, _inter alia_, the

Individuals with Disabilities Education Improvement Act ("IDEA"),

20 U.S.C. § 1400 _et seq._, Plaintiff T.C., on behalf of I.M.

(hereafter, "Plaintiff" or "Parent"), seeks review and reversal of

the August 26, 2022 decision of the State Review Officer ("SRO")

(hereafter, the "SRO Decision"), which Decision reversed the June

15, 2022 decision and order of the Impartial Hearing Officer

("IHO") (hereafter, the "IHO Decision"). (See Compl., ECF No. 1.)

Among other things, Plaintiff alleges the IHO correctly found

Plaintiff was entitled to tuition funding because Defendant William Floyd Union Free School District ("Defendant" of "School District") failed to offer I.M. a free appropriate public education ("FAPE") through an individualized education program ("IEP") developed by the School District's Committee on Special Education ("CSE"), and the SRO erred in reversing the IHO Decision. (See id. ¶3.) Now, via the instant summary judgment Motion (hereafter, the "Motion") (see ECF No. 18), Plaintiff seeks "modified de novo review[] and reversal of the SRO's decision and an award of full tuition and transportation reimbursement relief and costs and expenses for I.M.'s program [at the Vincent Smith School ("VSS")] for the 2021-2022 school year." (Thivierge First Decl., ECF No. 18-1, ¶5; see also Support Memo, ECF No. 18-2; Thivierge Second Decl., ECF No. 18-6; Reply, ECF No. 18-7.) The School District opposes the Motion. (See Opp'n, ECF No. 18-5; Mergeche First Decl., ECF No. 18-3; Mergeche Second Decl., ECF No. 18-9; Sur-Reply, ECF No. 18-10.) For the reasons that follow, the Motion is DENIED.


[Remainder of page intentionally left blank.]

BACKGROUND

I.   Relevant Factual Background[1]

        The majority of the underlying facts leading to this action are not in dispute.  Rather, as more fully discussed, below, the core disputed fact is whether the School District provided I.M. a FAPE and, if not, whether the School District is liable to reimburse the Parent for placing I.M. in a private program at VSS.[2]

---

[1]  Unless otherwise stated, the factual background is derived from the parties' Local Civil Rule 56.1 Statements.  Defendant's Rule 56.1 Statement (see ECF No. 18-4) shall be cited as "56.1 Stmt." Plaintiffs' Reponse to Defendant's Rule 56.1 Statement (see ECF No. 18-8) shall be cited as "56.1 Resp."
        Herein, internal quotation marks and citations in the 56.1 Statement and Response have been omitted.  A standalone citation to the Rule 56.1 Statement or Response denotes the Court has determined the underlying factual allegation is undisputed. Further, citation to a party's Rule 56.1 Statement or Response incorporates by reference the party's citation(s), if any. However, in its discretion, the Court may cite directly to the underlying exhibit(s).
        The underlying Administrative Record is found in the Case Docket at ECF No. 17.  Plaintiff's exhibits are identified as "Ex. P-[#]"; Defendant's exhibits are identified as "Ex. D-[#]".  The IHO Decision is Ex. B to the Complaint.  (See ECF No. 1-4.)  The SRO Decision is Ex. A to the Complaint.  (See ECF No. 1-3.)  When citing either the IHO or SRO Decision, the Court will use the internal page numbers of those Decisions.  Citations to "Tr." refer to the hearing transcript of the IHO Hearing.  (See ECF No. 17-4; see also infra at 11-12 (defining "IHO Hearing").)

[2]  "VSS is a small, independent private school catering to children with learning disorders, dyslexia, dysgraphia, and dyscalculia and provides services in small classes with differentiated instruction."  (IHO Decision at 24 (citation omitted); see also supra note 7.)

A.  Generally

I.M., the student at issue (hereafter, "I.M." or "Student"), was born in January 2010 and is currently 15-years-old. She resides with her mother, Plaintiff, in Suffolk County, New York.  The Student has been diagnosed with (1) Specific Learning Disorder, With Impairment in Reading: word reading accuracy, reading rate or fluency, reading comprehension; specific learning disorder, with impairment in written expression; spelling accuracy, grammar and punctuation accuracy, clarity or organization of written expression; and (2) Attention-Deficit/Hyperactivity Disorder, Combined Presentation.  The Student attended Kindergarten and First Grade at William Floyd Elementary School, a School District public school, where she received non-mandated Resource Room[3] aid as a general education

---

[3]  "Resource Room" is nomenclature for the N.Y.S. Education Department's:

> special education program for a student with a disability registered in either a special class or general education class who is in need of specialized supplementary instruction in an individual or small group setting for a portion of the school day.  Resource room programs are for the purpose of supplementing the general education or special education classroom instruction of students with disabilities who are in need of such supplemental programs.  This means that instruction is not provided in place of the student's regular academic instruction.

N.Y.S. Educ. Dep't, Special Education: Continuum of Special Education Services for School-Age Students with Disabilities,

intervention, prior to being referred to special education.  For Second Grade, the Student was classified as a student with a Learning Disability; therefore, she was placed in the Integrated Co-Teaching Class at John S. Hobart Elementary, also a School District public school.  For Third Grade, I.M. was placed in a 15:1 Special Class at William Floyd Elementary.  It was recommended the Student continue in the 15:1 Class at John S. Hobart Elementary for Fourth Grade.  Defendant contends "the Parent parentally placed [I.M.]" at VSS (56.1 Stmt. ¶10), while Plaintiff asserts she "unilaterally plac[ed] I.M. at VSS due to the [School] District's failure to provide I.M. with a FAPE." (56.1 Resp. ¶6.) Nonetheless, the Student remained at VSS for Fifth Grade.  In April 2018, the Student was privately evaluated by Amanda Addolorato Macdonald, Psy.D.  In December 2019, the Student was privately re-evaluated by Dr. David Sukiennik, Psy.D.

B.    The 2021 Re-Evaluation

Due for re-evaluation, in Spring 2021, the School District scheduled the Student for the following assessments:  a psycho-educational evaluation; an independent reading evaluation;

---

Resource Room Program, https://www.nysed.gov/special-education/continuum-special-education-services-school-age-students-disabilities#:~:text=Resource%20room%20program%20is%20a%20special%20education,for%20a%20portion%20of%20the%20school%20day.&text=This%20means%20that%20instruction%20is%20not%20provided,place%20of%20the%20student's%20regular%20academic%20instruction, (last visited Feb. 27, 2025).

classroom observation and occupational therapy ("OT").  Thus, on January 12, 2021 (i.e., during the 2020-2021 school year), on behalf of the School District, Elaine Micali ("Micali") conducted an Independent Reading Evaluation of I.M.  According to the School District, in her assessment of I.M., Micali noted, in relevant part, that in comparison to with I.M.'s prior Comprehensive Test of Phonological Processing scores, I.M. made little or no progress in phonological awareness, phonological memory or rapid symbolic naming since I.M.'s initial evaluation in April 2018, prior to her placement in VSS.  Plaintiff disputes the characterization of Macali's assessment results, asserting: "Qualitatively, Dr. Micali's report demonstrates that in Phonological Memory, I.M. went from the 'Very Poor' range in 2018 to the 'Below Average' range in 2021.  In Phonological Processing, I.M. went from functioning in the 'Poor' range in 2018 to the 'Average' range in 2021." (56.1 Resp. ¶8.)  Further, on February 5, 2021, the School District conducted a Confidential Psycho-Educational Report as a part of its triennial assessment of I.M., which included having Joshua David Zelin, a School District school psychologist, administer 10 subtests from the Wechsler Intelligence Scale for Children-Fifth Edition.

Thereafter, on April 19, 2021, the CSE convened to review the results of the Student's triennial evaluation (hereafter, the "Re-Evaluation"); the Re-Evaluation was discussed at length.  The

April 2021 CSE recommended the Student be placed in a Special Class (15:1; once daily for 4 hours and 12 minutes) and, for the remainder of the 2020-2021 school year, receive: (1) OT (small group 5:1; once weekly for 30 minutes); (2) OT (individual; once weekly for 30 minutes); (3) Specialized Reading (small group 5:1; five times weekly for 40 minutes); and (4) Specialized Reading (individual; once daily for one hour).  The April 2021 CSE further recommended summer services.

    C.   <u>The May 2021 CSE</u>

On May 18, 2021, in preparation for the upcoming 2021-2022 school year, a CSE convened for an annual review regarding I.M.  The School District maintains the May 2021 CSE relied upon the recently completed Re-Evaluation and updated information from VSS in conducting its review.  (<u>See</u> 56.1 Stmt ¶19 (citing Tr. 60-61).)  Plaintiff disputes that representation, claiming the School "District failed to meaningfully rely upon or consider the information provided by VSS by making recommendations that were a wild departure from that recommended by VSS."  (56.2 Resp. ¶10 (citing IHO Hr'g Tr. 362-63, 476, 506, and May 18 IEP[4]).)

The May 2021 CSE recommended the Student: be placed in a Special Class (15:1+1; once daily for 40 minutes for English language arts ("ELA"), math, science and social studies); and,

---

[4]  The May 2021 IEP is Defendant's Exhibit D-6.  (<u>See</u> ECF No. 17-6, at ECF pp.100-29.)

receive: OT (small group 5:1; once weekly for 30 minutes); OT (individual; once weekly for 30 minutes); Specialized Reading (small group 5:1; five times weekly for 40 minutes); Specialized Reading (individual; once daily for one hour); and, Psychological Counseling Services (individual; twice monthly for 30 minutes). (56.2 Stmt. ¶ 20.)   According to Plaintiff, the CSE also recommended I.M. be shadowed by a 1:1 aide, which she believed was too restrictive.   (See 56.2 Resp. ¶11 (citing Ex. D-6 at 23).) According to the School District: "[I]n recognition of the Parent's concerns regarding the Student's transition back into the [School] District[,] the CSE recommended the support of a teachers [sic] assistant".   (56.2 Stmt. ¶23); Parent contends this was not appropriate for I.M.   (See 56.2 Resp. ¶13; see also id. at ¶14.) The CSE also recommended summer services for I.M.

The School District maintains "the May 2021 CSE deviated from standard practice by developing reading goals that were reflective of Wilson methodology" to align with I.M.'s then-current performance levels at VSS, which utilized Wilson-based reading instruction.   (56.2 Stmt. ¶23.) Additionally, the CSE advised the Parent that the specialized reading services would be fulfilled by the classroom teacher and through a contract with Da Vinci Collaborative ("Da Vinci"), an outside organization that provided various academic support to the School District.   (See 56.2 Stmt. ¶21; see also IHO Decision at 13

(describing Da Vinci as "a private service provider of specialized reading instruction that contracts with the [School District] to deliver instruction to [School] District students").)    While Plaintiff admits the School District so advised her, she disputes the School District "was accurate in claiming it could appropriately provide specialized reading services" via Da Vinci since Da Vinci, as well as the classroom teacher, lacked the required certification to do so.  (56.2 Resp. ¶12.)    Further, in making its recommendation, the May 2021 CSE permitted the VSS team to share updates regarding the Student's then-present levels of performance, which were reviewed by the CSE chairperson.  (56.2 Stmt. ¶22.)    The parties dispute whether the CSE's determinations regarding I.M. were for the least restrictive environment and were predetermined.  (Compare 56.2 Stmt. ¶22, with 56.2 Resp. ¶13; see also 56.2 Resp. ¶14.)

    D.    The September 2021 CSE

       Precipitating the September 2021 CSE, "[o]n August 16, 2021[,] the Parent informed the [School] District that she disagreed with the CSE's recommendation and that she was unilaterally placing her daughter at the VSS for the 2021-2022 school year and seeking tuition costs and expenses of that program and transportation for the District's alleged procedural and substantive denial of a [FAPE]."  (IHO Decision at 2; see also infra at note 6.)    In response to the Parent's August 16, 2021

letter, the CSE reconvened on September 14, 2021.  Prior to the September 2021 meeting, Parent had visited the School District's recommended programs, which visit was facilitated by Michele Gode, principal of Paca Middle School.  After its September 14 meeting, the CSE recommended the Student: be placed in a Special Class (15:1+1; once daily for 40 minutes for ELA, math, science and social studies); and, receive: OT (small group 5:1; once weekly for 30 minutes); OT (individual; once weekly for 30 minutes); Specialized Reading (small group 5:1; five times weekly for 40 minutes); Specialized Reading (individual; once daily for one hour); and, Psychological Counseling Services (individual; twice monthly for 30 minutes).  (See 56.2 Stmt. ¶26.)  In addition, according to Plaintiff, the School District also recommended I.M. be shadowed by a 1:1 aide.  (See 56.2 Resp. ¶17.)

    E.   <u>The January 2022 CSE</u>

        Then, in response to the Parent's December 3, 2021 letter,[5] the CSE again reconvened in January 2022.  (See 56.2 Stmt. ¶27.)  As a result, the CSE made the following recommendations: the Student be placed in a Special Class (15:1+1; once daily for 40 minutes for ELA, math, science and social studies); and, the

---

[5]  "On December 3, 2021, the Parent gave further notice to the [School] District that she would keep [I.M.] enrolled in the VSS for the 2021-2022 school year."  (IHO Decision at 2; <u>see also</u> <u>infra</u> at note 6.)

Student receive: OT (small group 5:1; once weekly for 30 minutes); OT (individual; once weekly for 30 minutes); Specialized Reading (small group 5:1; five times weekly for 40 minutes) Specialized Reading (individual; once daily for one hour); and, Psychological Counseling Services (individual; twice monthly for 30 minutes). (See 56.2 Stmt. ¶28.)   Again, Plaintiff contends the School District further recommended I.M. be shadowed by a 1:1 aide. (See 56.2 Resp. ¶19.)

II.   Relevant Procedural Background

     A.   At the Agency Level[6]

       On December 6, 2021 and pursuant to the IDEA, the Parent commenced a due process complaint against the School District (hereafter, the "IDEA Complaint").  Parent sought a finding that the School District failed to offer I.M. a FAPE for the 2021-2022 school year and an award of tuition reimbursement for Parent's unilateral placement of I.M. at VSS for the 2021-2022 school year. A due process hearing was conducted over several non-consecutive days, commencing in March 2022 and concluding in April 2022 (hereafter, the "IHO Hearing").  Ultimately, the IHO found the School District's IEP failed to offer the Student a FAPE in the

---

[6]   Neither party provided the relevant state-level procedural history which precipitated this case.  For the reader's convenience and to provide the necessary context for its decision herein, the Court has relied upon the IHO Decision and the SRO Decision to glean those relevant facts.  None of the facts recited in this subsection can reasonably be found to be in material dispute.

least restrictive environment. Therefore, among other things, in his June 15, 2022 Decision, the IHO ordered the Parent was entitled to an award of tuition reimbursement and related expenses for Parent's unilateral placement of I.M. at VSS for the 2021-2022 school year.

The School District appealed the IHO Decision, seeking its reversal. Plaintiff cross-appealed; among other things, she challenged the IHO's findings as to the School District's recommended class size and 1:1 aide for I.M., as well as the IHO's alleged failure to address her claims that the School District predetermined its recommendations and denied her meaningful participation in the development of I.M.'s IEP. Extensively citing to the record below, as well as to relevant case law, the SRO concluded the evidence in the hearing record supported a finding the School District offered Student a FAPE for the 2021-2022 school year; therefore, it was not necessary to reach the issue whether the VSS was an appropriate unilateral placement for Student or whether equitable considerations supported an award of tuition reimbursement. The SRO sustained the School District's appeal, dismissed Parent's cross-appeal, and reversed the IHO Decision to the extent it found the School District failed to offer Student a FAPE for the 2021-2022 school year and ordered the School District fund Student's tuition costs at VSS, i.e., reimburse the Parent.

B.  <u>In this Court</u>

Thereafter, Plaintiff commenced this action on November 22, 2022.  (<u>See</u> Compl., ECF No. 1.)  She seeks the reversal of the SRO Decision, which reversed the favorable IHO Decision directing the School District to reimburse her for the cost of enrolling I.M. at VSS, as well as other related expenses.  (<u>See</u> <u>id.</u> ¶¶ 2-4, 14.)  The School District denied Plaintiff's allegations, and, as one of several affirmative defenses, contends the SRO Decision was well-founded in both fact and law and, therefore, is entitled to deference from this Court.  (<u>See generally</u> Ans.; <u>see</u> <u>id.</u> at ¶142 (Sixth Affirmative Defense).)  Because this is an action seeking review of the Administrative Record of the N.Y.S. Department of Education Office of State Review, Plaintiff has sought summary judgment.  (<u>See, e.g.</u>, Jan. 18, 2023 Letter, ECF No. 11.)  With the relevant Administrative Record and fully briefed Motion now before it, the Court proceeds with its deferential review.

<u>DISCUSSION</u>

I.  <u>The Applicable Standard and the Decisions at Issue</u>

A.  <u>Summary Judgment in the Context of an IDEA Challenge</u>

The standard for deciding a Rule 56 summary judgment motion is well-established.  <u>See, e.g.</u>, <u>Lavender v. Verizon N.Y. Inc.</u>, No 17-CV-6687, 2023 WL 1863245, at *8 (E.D.N.Y. Feb. 9, 2023); <u>see also</u> <u>Butler v. County of Suffolk</u>, No. 11-CV-2602, 2023 WL 5096218, at *18-20 (E.D.N.Y. Aug. 8, 2023) (similarly

articulating summary judgment standard). Yet, in the context of the IDEA, the Second Circuit has further explained:

> Generally, either "party aggrieved" by the findings of the SRO "shall have the right to bring a civil action" in either state or federal court. 20 U.S.C. § 1415(i)(2)(A). When such an action is brought in federal district court, the court reviews the records of all of the prior administrative hearings and must hear additional evidence if so requested by either of the parties. Id. at § 1415(i)(2)(c). The court typically considers the propriety of the IEP on the parties' cross motions for summary judgment.

> However,

>> a motion for summary judgment in an IDEA case often triggers more than an inquiry into possible disputed issues of fact. Rather, the motion serves as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in [the] IDEA [in developing the specific IEP at issue] and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational benefits.

> Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ., 397 F.3d 77, 83 n.3 (2d Cir. 2005) (internal quotation marks omitted). "Though the parties in an IDEA action may call the procedure 'a motion for summary judgment,' the procedure is in substance an appeal from an administrative determination, not a summary judgment [motion]." Id. (ellipsis, brackets, and citation omitted). "[B]asing its decision on the preponderance of the evidence, [the court is required to] grant such relief as the court determines is appropriate." § 1415(i)(2)(C)(iii).

M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 225–26 (2d Cir. 2012).

Fellow jurist of this District, Honorable Eric Komitee,

provides further relevant elucidation:

> "The review is substantive and considers more than whether a material fact is disputed." M.Z. v. N.Y.C. Dep't of Educ., No. 12-CV-4111, 2013 WL 1314992, at *1 (S.D.N.Y. Mar. 21, 2013). "[B]asing its decision on the preponderance of the evidence, [the court] shall grant such relief as [it] determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). "[T]he standard for reviewing administrative determinations requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete de novo review." M.H., 685 F.3d at 244.
>     In deciding an IDEA case, a court will "generally defer to the final decision of the state authorities." M.H., 685 F.3d at 241. Still, "in policing the states' adjudication of IDEA matters," a court must "determin[e] the weight due any particular administrative finding." Id. at 244. Because of the specialized educational considerations involved, "[d]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures." Id. District courts also apply a deferential standard of review to the IHO's credibility determinations. See id. at 240.

V.A. v. City of N.Y., No. 20-CV-0981, 2022 WL 1469394, at *4

(E.D.N.Y. May 10, 2022). Further:

> [t]he deference owed depends on both the quality of the opinion and the court's institutional competence. [M.H., 685 F.3d at 244.] Under our deferential review, "[w]here the IHO and SRO disagree," we "defer to the reasoned conclusions of the SRO as the final state administrative determination." Id. at 246. However, where the SRO's determinations

> are insufficiently reasoned to merit
> deference, the courts should defer to the
> IHO's analysis. <u>Id.</u> at 246, 252.
> Additionally, the courts should defer to the
> IHO's analysis when considering an issue not
> reached by the SRO. <u>Id.</u> at 252.

<u>C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.</u>, 746 F.3d 68, 77 (2d Cir. 2014) (omitting internal footnote). And, "[a] district court must grant particular deference to the administrative proceedings when, as in this case, its decision is based solely on the same evidence in the administrative record." <u>M.H. ex rel. A.H. v. Monroe-Woodbury Cent. Sch. Dist.</u>, 250 F. App'x 428429 (2d Cir. Oct. 12, 2007). However, a district court's deference "does not apply to questions of law." <u>V.A. v. City of N.Y.</u>, 2022 WL 1469394, at *4 (citing <u>B.K. v. N.Y.C. Dep't of Educ.</u>, 12 F. Supp. 3d 343, 356 (E.D.N.Y. 2014) (the deferential standard "is not implicated with respect to issues of law, such as the proper interpretation of the federal statute and its requirements")). Finally, "[t]he party seeking reversal of an SRO's decision bears the burden of demonstrating that the decision is not entitled to deference" <u>F.L. v. Bd. of Educ. of Great Neck U.F.S.D.</u>, 274 F. Supp. 3d 94, 112 (E.D.N.Y. 2017) (citing <u>M.H.</u>, 685 F.3d at 224-25); <u>aff'd</u>, 735 F. App'x 38 (2d Cir. Aug. 24, 2018).

B.  <u>The IHO Decision</u>[7]

The CSE's May 2021 IEP recommendation is the plan at issue (hereafter, the "May 2021 IEP" or "Subject IEP").  In making his decision as to the Subject IEP, the IHO applied the well-established three-pronged <u>Burlington/Carter</u> test, first articulated by the Supreme Court in <u>School Committee of the Town of Burlington, Massachusetts v. Department of Education of the Commonwealth of Massachusetts</u>, 471 U.S. 359 (1985), <u>see also Florence County School District v. Carter, 510 U.S. 7 (1993)</u>, to determine whether Plaintiff was entitled to the tuition reimbursement she sought for the School District's alleged failure to provide I.M. with a FAPE.  (<u>See</u> IHO Decision at 18-19 (articulating applicable <u>Burlington</u> test; <u>see also</u> <u>id.</u> at 19-24 (analyzing Prong I), at 24-25 (analyzing Prong II), and at 25 (analyzing Prong III)); <u>see also</u> <u>C.F.</u>, 746 F.3d 68 (instructing claims for tuition reimbursement under the IDEA are governed by the <u>Burlington/Carter</u> Test "which looks to (1) whether the school district's proposed [IEP] will provide the child with a [FAPE];

---

[7]  The IHO identified the exhibits (by numbers) considered and the witnesses who testified over the four non-consecutive days' of hearing on Plaintiff's IDEA Complaint.  (<u>See</u> IHO Decision at 13-14; <u>see also</u> <u>id.</u> at 28 (providing a description of the admitted exhibits).)  The IHO also observed that Plaintiff, I.M.'s mother, participated in all the CSE meetings regarding I.M.  (<u>See</u> <u>id.</u> at 14.)

(2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities").

As for Prong I (appropriateness of IEP offered): The IHO examined: I.M.'s reading needs, which "is the Student's most challenging area of deficit" (IHO Decision at 20); the CSE's recommended placement of the Student in a 15:1+1 Special Class, together with the assistance of an aide (see id. at 20-21); the composition of the Special Class (see id. at 21); the IEP including adaptive physical education ("APE") for the Student (see id. at 21-22); the methodology to be used in delivering I.M.'s reading instruction (see id. at 22); the goals set for I.M. in the IEP (see id. at 22-23); the IEP providing for I.M. to receive OT in both a group setting and on an individual basis (see id. at 23); the CSE's recommendation I.M. receive some counseling services (see id. at 23-24); and, the CSE's declining to initiate a functional behavioral assessment ("FBA") or develop a behavioral intervention plan ("BIP") (see id. at 24).  The IHO concluded:

> Although the CSE's recommended IEP is appropriate in some respects, the deficiencies in providing specialized reading support during the school day, the insufficient class profile knowledge base for the CSE's recommendation, and the inappropriate placement of the Student in Adaptive Physical Education constitute a denial of a [FAPE].

(Id. at 24.)

As for Prong II (appropriateness of private placement):
The IHO found "the VSS program is, at least, minimally appropriate"
and I.M. had made some progress since her placement at VSS.  (Id.)
He underscored the very small sized classes the Student attended
and that she "d[id] not display significant behaviors that
interfere with her learning."  (Id. at 25.)  Further, he was
unconvinced the use of two different reading methods, employed by
VSS, had any adverse effect since "[t]he Woodcock Reading Master
Test-3rd Edition [] used to measure progress show[ed] that the
Student's scores from September 2019 to May 2021 have improved
with the Student making progress each year."  (Id. (citations
omitted).)  In addition: VSS's science, social studies, and math
classes appeared to be addressing the Student's academic needs;
I.M. participated in gym, art, and clubs at VSS; and, I.M. received
OT at VSS.  (See id.)  Furthermore, the VSS teaching staff
collaborated regarding I.M.'s needs and progress.  (See id.)  Thus,
placement as VSS was found to by "sufficient under the current
standards for unilateral placements."  (Id.)

As for Prong III (equitable considerations):  Observing
Plaintiff fully participated in the CSE process and development of
I.M.'s Subject IEP, the IHO also stated he found Plaintiff
"credible when she indicated that, although having signed a
contract with VSS earlier, she would have considered a public-
school placement if the CSE had made a recommendation she would

accept." (Id. at 26.) Apparently based upon said finding, the IHO summarily concluded the equities did not bar Plaintiff's claims. (See id.)

Hence, the IHO ordered, inter alia: the Student's 2021-2022 IEP did not offer her a FAPE; the Parent's unilateral placement of Student at VSS for the 2021-2022 school year was appropriate; and, the Parent was entitled to an award of tuition and related expenses for said placement. The IHO's determination was limited to the 2021-2022 school year. (See id.)

C.    The SRO Decision

After providing I.M.'s general educational background and a summary of the IHO Decision, the SRO proceeded to identify the parties' respective bases for appealing. The School District asserted the IHO erred, inter alia: in finding deficiencies in the CSEs' recommendations regarding specialized reading support, as being inconsistent with the record evidence; in concluding there was insufficient information regarding the class profile; in considering Parent's argument regarding the APE recommendation, since it was outside the scope of her IDEA Complaint; in considering Parent's argument regarding the School District conducting an FBA and BIP, as being outside the scope of her IDEA Complaint; and, in finding the CSEs did not properly consider Parent's concerns or the program recommendations. (SRO Decision at 9-10.) Unsurprisingly, Parent agreed with the IHO's

determination the School District failed to provide Student with a FAPE since the School District: "fail[ed] to provide an appropriate reading program"; "inappropriately recommended that the [S]tudent be placed in [APE]"; and, "failed to recommend placement for the [S]tudent in a properly composed class with peers of similar needs." (Id. at 10.) Nonetheless, Parent appealed the IHO's decisions regarding: Student's placement in a 15:1+1 special class with the support of a 1:1 aide; the Parent's contentions that the School District's recommendations were predetermined and it denied her meaningful participation in the CSEs; the School District's not having to consider conducting an FBA or developing a BIP; the appropriateness of Student's goals; and, the appropriateness of the School District's OT recommendations. (See id. at 10-11.)

As an initial matter, the SRO determined, because Parent did not raise the issue of APE in her IDEA Complaint, and based upon the record evidence, the School District had not "opened the door" to same; therefore, this argument was outside the scope of what could be properly considered by the IHO. (Id. at 13-14 (citing, inter alia, B.P. v. N.Y.C. Dep't of Educ., 841 F. Supp. 2d 605, 611 (E.D.N.Y. 2012) ("The scope of the inquiry of the IHO, and therefore the SRO . . . , is limited to matters either raised in the . . . impartial hearing request or agreed to by the [opposing

party].")).)    "Therefore, the IHO's findings related to adapted physical education [were] reversed."  (Id. at 14.)

The  SRO  next  turned  to  Parent's  claims  regarding predetermination and parental participation.  As is evident from the SRO Decision, the SRO conducted a thorough review of the record below, including reviewing the IHO Hearing transcripts.  (See id. at 15-17.)  Indeed, he cited to ample evidence considered by the CSE in formulating its recommendations.  Moreover, the evidence established both Parent and VSS personal participated in said CSE meetings.  (See id.; see also id. at 17 ("[T]he evidence in the hearing record demonstrates that both the [P]arent and staff of [VSS] were given the opportunity to participate in the development of the [S]tudent's educational program for the 2021-2022 school year.").)  Based upon relevant case law, the SRO concluded: "The [P]arent's preference for the [S]tudent to remain at [VSS] is understandable; however, the [School D]istrict was not required to consider placement of the [S]tudent in a nonpublic school once it determined that a less restrictive placement was appropriate to address the [S]tudent's needs." (Id. (citations omitted).)  Hence, Parent's  predetermination  and  participation  claims  were unsustainable upon the IHO Hearing record.  (See id.)

Turning to the substantive claims, the SRO engaged in an expansive review of the record below in finding the School District had provided Student a FAPE for the 2021-2022 school year.  (See

SRO Decision at 17-37.)   Observing "[t]he May 2021 IEP included reports of specific formal test results consistent with the [listed] evaluations [], as well as evaluation results obtained via previous evaluations conducted . . .", the SRO clarified, "[t]he parties do not dispute the adequacy of the evaluative information before the May 2021 CSE or the sufficiency of the May 2021 IEP present levels of performance"; however, he explained that a description of such information was "necessary to determine whether the May 2021 CSE's recommendation of a 15:1+1 special class with 1:1 aide support in conjunction with specialized reading instruction, related services[,] and other supports provided the [S]tudent with an appropriate education program for the 2021-22 school year." (Id. at 18.)   He then proceeded to examine, in detail, six subsections that comprised the May 2021 IEP: the Student's (1) then-present levels of performance and her specific needs (see id. at 18-22); (2) annual goals and need for OT (see id. at 22-25); (3) alleged interfering behaviors (see id. at 25-27); (4) proposed placement in a 15:1+1 special class with a 1:1 support aide (see id. at 27-30); (5) recommended specialized reading instructions (see id. at 30-34); and (6) proposed placement in a 15:1+1 special class in the absence of sufficient knowledge of the class profile (see id. at 34-37).

1.   Present Levels of Performance and Student Needs

The SRO detailed the information used in developing the Student's May 2021 IEP.  (See SRO Decision at 18-19.)  He proceeded to address the Student's needs in various areas: spelling (see id. at 18-19); reading (see id. at 19-20); writing (see id. at 20); math (see id.); socialization (see id. at 20-21); physical education (see id. at 21); OT (see id.); and, management needs (see id. at 21-22).  Again, the SRO provided copious citations to the underlying record supporting his findings and conclusions. Throughout this subsection, the SRO identified substantial input from VSS faculty, staff, and related reports.

2.   Annual Goals and OT

The SRO reported that, due to conflicting information provided by VSS staff at the CSE meeting regarding whether Student had mastered specific annual goals, the IHO found the School District "correctly included the [Student's] annual goals [i]n the May 2021 IEP."  (SRO Decision at 22.)  On appeal, Parent argued this was error since the IEP included goals Student had mastered (hereafter, the "Mastered Goals").  (See id.)  However, the SRO highlighted Parent failed to identify the Mastered Goals in her answer and cross-appeal, instead citing to a page of transcript referencing Student's Annual Goal Numbers 22, 23, and 24 included in the May 2021 IEP (hereafter, the "Disputed Goals").  (See id.) The Disputed Goals pertain to Student's motor skills.  (See id. at

23.)  The SRO recounted the testimony regarding discussions of Student's goals and, in particular, that Student's VSS occupational therapist did not recall specifics regarding the April 2021 CSE meeting or the May 2021 CSE meeting.  (See id.; see also id. at 24.)  Moreover, it was "unclear from the occupational therapist's testimony when the [S]tudent mastered the May 2021 IEP [Disputed Goals], and there [wa]s no indication in the hearing record that the occupational therapist objected to these goals at the time of the May 2021 CSE meeting."  (Id. at 24.)  In sum, the SRO determined:

> While the CSE should design annual goals that are achievable within the time period that the proposed IEP is in effect, in this instance even if the [S]tudent had mastered some of the annual goals included on the May 2021 IEP[, i.e., the Disputed Goals], the inclusion of those [Disputed G]oals does not rise to the level of denying the [S]tudent a FAPE, as [1] the [Disputed Goals] are limited to addressing the [S]tudent's motor skills, [2] there are additional appropriate goals that also address motor skills, and [3] an IEP does not need to identify annual goals as the vehicle for addressing each and every need in order to conclude that the IEP offered the [S]tudent a FAPE.

(Id. (citations omitted).)  Therefore, there was "no basis in the hearing record to disturb the IHO's finding that the [S]tudent's annual goals were appropriate."  (Id.)

The SRO also upheld the IHO's finding that the recommended one weekly session of group OT and one weekly session

of individual OT for Student was appropriate, despite Parent's claim that it was error.  (See id. at 24-25.)  The SRO recounted that, while Student's VSS occupational therapist testified that she disagreed with the CSE's blended recommendation, said occupational therapist had conceded "one of the [S]tudent's annual goals was to improve 'attending and independence to conduct age-appropriate work'".  (Id. at 24.)  Further, the VSS occupational therapist testified "she did not recall whether she voiced her disagreement with the recommendation for group OT during the May 2021 CSE meeting."  (Id.)  Moreover, the VSS occupational therapist had reviewed the School District's OT evaluation report, which she agreed accurately reflected the Student's needs; yet, that evaluation stated Student was receiving one weekly individual OT session and one weekly group OT session.  (See id. at 25.)

Upon review, the SRO concluded "the evidence in the hearing record d[id] not provide adequate support to overturn the IHO's determination."  (Id.)  He highlighted the recommendation was consistent with the School District's inaccurate OT evaluation report, which the VSS occupational therapist reviewed, but did not correct, and, in any event, "the evidence in the hearing record indicated that the [S]tudent was very social and needed to work on improving attending and independent work completion . . . which could be addressed in a small group setting."  (Id.)

### 3. Consideration of Interfering Behaviors

As to the purported error Parent would assign to the IEP for not recommending the conducting of a FBA or developing a BIP, after thoroughly discussing the applicable law and regulations, the SRO found none. (See SRO Decision at 26-27.) He explained Parent's reliance upon the Student's December 2019 neuropsychological re-evaluation report (hereafter, the "December 2019 Report") was unavailing. First, review of said December 2019 Report evinced "the evaluator concluded that the [S]tudent did not meet the criteria for any anxiety or depressive disorder at that time and suggested that those symptoms be 'monitored'". (Id.) Second, "the May 2021 IEP did not list the December 2019 . . . [R]eport among the evaluation information considered by the May 2021 CSE" and there was no claim Parent asked for its consideration, but that the CSE declined said request. (Id.) Moreover, "[P]arent's argument that the [School D]istrict failed to consider conducting social/emotional testing is not supported by the evidence in the hearing record." (Id.) In addition to identifying the record evidence showing the School District did consider Student's social and emotional needs (see id. at 26-27), the SRO underscored "an FBA was not conducted and a BIP was not developed based on the feedback the May 2021 CSE received from [VSS] staff indicating that the [S]tudent did not present with behavior that was impeding her learning or the learning of others."

(Id. at 27 (citing IHO Hr'g Tr.).)  And, "the May 2021 CSE developed a social/emotional annual goal and recommended supports and other strategies to address behaviors, including 'the support of counseling to re-acclimate into a public school setting'".  (Id. (quoting May 2021 IEP).)  Hence, "the hearing record support[ed] the IHO's finding that the [School D]istrict was not required to conduct an FBA or develop a BIP for the [S]tudent for the 2021-22 school year, and also that the [School D]istrict provided supports and services to meet [Student's] social/emotional needs."  (Id.)

4.    The 15:1+1 Special Class and 1:1 Aide

Once more, the SRO began his review by discussing the relevant regulations and statutes applicable to determining a student's class placement.  (See SRO at 28.)  He then proceeded to provide a thorough summary of the May 2021 CSE's recommendation for Student as articulated in its May 2021 IEP.  (See id. at 28-29 (citing May 2021 IEP).)  The SRO further underscored "the CSE chairperson testified that after the May 2021 CSE considered the continuum of services, and after determining other options were not appropriate for the [S]tudent, the May 2021 CSE recommended a 15:1+1 special class with the support of a 1:1 aide for the [S]tudent to help her address her organizational and attentional needs in her core classes."  (Id. at 29 (citing IHO Hr'g Tr.).)  With further citations to testimony from the School District's psychologist, the SRO elucidated why "the hearing record

reflect[ed] that the [School D]istrict developed a comprehensive
program to address the [S]tudent's needs" and, therefore, why there
was "no reason to depart from the IHO's finding that the [School
D]istrict's recommendation of a 15:1+1 special class with the
additional support of a 1:1 aide were sufficient to meet the
[S]tudent's needs and provide her with an educational benefit."
(Id. at 29, 30.)

    5. <u>Specialized Reading Instruction</u>

    In response to the School District's challenge of the
IHO's findings regarding the Student's recommended specialized
reading support, the SRO held said findings were "legally flawed
and must be reversed."  (SRO at 30.)  The SRO explained, per the
May 2021 IEP, the CSE recommended Student receive the following
specialized reading instruction: (a) during the school term: both
one-hour daily, individualized instruction and 40-minute, daily
group instruction, with both instruction sessions to be "in a
special location"; and (b) during the summer: one-hour daily,
individualized instruction delivered at home.  (See id. at 31
(citing May 2021 IEP).)  Further, the School District's "May 18,
2021 prior written notice indicated that the [S]tudent's daily
individual specialized reading instruction would be delivered at
home and the daily group specialized reding instruction would be
delivered during the school day."  (Id. (citing May 2021 Prior
Written Notice).)  The SRO explained that, pursuant to applicable

state regulations and guidelines, the May 2021 IEP specialized reading instructions recommendation was compliant with what is required of a FAPE. (See id. at 31-32; see also id. at 32 ("Here, the [School D]istrict, in its prior written notice, advised the [P]arent that the [S]tudent would have received group specialized reading instruction during the school day and individual specialized reading instruction after school with is consistent with [the Office of Special Education Programs'] guidance." (citation omitted)).)

    To the extent the specialized reading instructions recommendations were not more specific in identifying the location of services for the school year, that was merely a "procedural violation" that, under the facts of this case, did not impede Student's right to a FAPE or cause her to be deprived of an educational benefit. (Id. at 32.) The SRO elucidated: Testimony from the IHO Hearing made clear "the May 2021 IEP delineation of 'special location' for specialized reading instruction was to give providers flexibility in where they could provide the service (e.g., provider's classroom, therapy room, or push-in into a classroom)." (Id.) Moreover, any concerns the Parent or VSS staff had with providing Student's individualized instruction after school, e.g., that the Student would be fatigued, should have been discussed at the May 2021 CSE meeting, but "there [was] no

indication that these concerns were raised at the meeting or otherwise communicated to the [School D]istrict". (Id. at 32-33.)

Finally, the SRO agreed with the School District that the IHO erred in finding, without any record support, the School District could not provide Student's group specialized reading instruction by properly certified professionals. (See id. at 33-34.) In doing so, the SRO underscored relevant testimony from the IHO Hearing:

> The CSE chairperson testified that Wilson reading instruction was "a multisensory approach [to] reading and writing intervention and as a methodology, it follow[ed] the Orton-Gillingham methodologies for reading and writing instruction". The CSE chairperson further testified that as a matter of practice, specific methodology or pedagogy were not referenced on an IEP; however, in the case of this student, the goals were developed with Wilson-based reading instruction in mind because the CSE "felt it necessary to capture the [student]'s present levels of performance in the program that she was currently working on at Vincent Smith". Review of the May 2021 IEP shows that it explicitly indicated the student "should continue to participate in an Orton Gillingham-based [] program to improve her sound-symbol association and syllable awareness for reading and spelling".

(Id. at 33-34 (internal citations omitted).) Thus, given the record evidence, which the IHO appeared to disregard, and because, "[a]ccording to State regulation, the proposed providers were properly licensed or certified to provide the [S]tudent with

specially designed reading instruction", the SRO concluded the IHO's finding on this point had to be overturned. (Id. at 34.)

### 6. The 15:1+1 Special Class Profile

Finally, the SRO rejected the IHO's finding that, because the School District lacked knowledge regarding the class profile at the assigned school, its recommendation of a 15:1+1 special class placement recommendation was flawed and inappropriate. (See SRO Decision at 34-37.) Instead, he explained "the sufficiency of the program offered by [a school] district must be determined on the basis of the IEP itself" and claims that assigned schools are incapable of implementing an IEP are not sustainable if speculative. (Id. at 35.) His rationale had robust case law support from the Second Circuit. (See id. (collecting cases).) The SRO continued, clarifying that, "[a]lthough neither the IDEA nor federal regulations require students who attend a special class setting to be grouped in any particular manner," there are state regulations setting forth some requirements school districts must follow for grouping students with disabilities. (Id.; see also id. at 36 (discussing grouping in accordance with age ranges and the concept of "functional grouping").) He continued, "[w]hile the district must implement a student's IEP consistent with the grouping requirements of State regulations, the Second Circuit has held that the IDEA does 'not expressly require school districts to provide parents with class profiles.'"

(Id. at 36 (quoting Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 (2d Cir. 2005); further citations omitted).)

Upon review, the SRO found the principal of the assigned school (hereafter, the "Principal") had met with the Parent for a site visit, but, due to student privacy concerns, had declined to share information specific to other students. Instead, according to record testimony, among other things, the Principal informed the Parent that, at the time of her site visit, there were eight students enrolled in the 15: 1 +1 special class and, functionally, while "there could be various disabilities, . . . the students had similar academic levels". (Id. at 36 (citing IHO Hr'g Tr. pp. 122, 123, 128-29).) The Principal further testified:

> [S]he informed the [P]arent what the students would be working on, how the teachers would differentiate instruction based on the [S]tudent's needs, and that the school used a Regents track curriculum that followed State standards. The [P]rincipal described the [S]tudent's teachers to the [P]arent and informed her that she "was going to make sure that [the S]tudent] had a [certified teaching assistant] . . . [who] was also a certified teacher" to provide the [S]tudent's 1:1 aide support.

(Id. (committing citations to IHO Hr'g Tr.).) Accordingly, upon the administrative record and relevant case law, the SRO concluded "concerns about the likelihood that the [S]tudent would be appropriately grouped with other students [was] speculative given that the [S]tudent never attended the assigned public school site".

(Id. (collecting cases); see also id. (stating "claims regarding grouping are inherently speculative as the district cannot guarantee the composition of the class that the student would have attended" (citation omitted; collecting cases)).)   Hence, the SRO concluded "the IHO's determination that the [School D]istrict's recommendation was flawed and inappropriate because it was not able to provide a class profile of the other students in the proposed 15: 1 +1 special class was erroneous".   (Id. at 37.)

–*–*–*–

In sum, the SRO concluded:   "[T]he evidence in the hearing record support[ed] a finding that the [School D]istrict offered the [S]tudent a FAPE for the 2021-22 school year" which ended "the necessary inquiry".   (Id. at 37.)   Thus, there was "no need to reach the issue of whether [VSS] was an appropriate unilateral placement for the [S]tudent or whether equitable considerations support[ed] an award of tuition reimbursement." (Id. (citing Burlington, 471 U.S. at 370; M.C. v. Voluntown Bd. of Educ., 226 F.3d 60, 66 (2d Cir. 2000)).)

II.   The Instant Case

A.   The Parties' Positions

1.   Plaintiff's Position

Plaintiff raised three overarching arguments:   the School District failed to provide I.M. a FAPE; in terms of programs and placement, VSS was appropriate for I.M.; and, the equites lie

in Plaintiff's favor.  As to Plaintiff's first argument regarding a FAPE, she raises eight sub-arguments:  (i) the School District failed to provide I.M. appropriate reading services; (b) the School District failed to make an appropriate class recommendation for I.M.; (c) the School District's program lacked appropriate peers for I.M.; (d) the School District failed to recommend appropriate related services for I.M.; (e) the School District's recommendation of APE was inappropriate for I.M.; (f) by denying Parent meaningful participation in the development of I.M.'s IEP, the School District violated I.M.'s procedural rights; (g) the School District failed to assess I.M.'s social and emotional needs; and (h) the School District failed to develop appropriate goals for I.M.  (See Support Memo at 8-22.)

### a.    Failure to Provide I.M. a FAPE

#### i.    As to Appropriate Reading Services

Plaintiff contends the School District failed to provide I.M. appropriate reading instructions, which the IHO properly found and which finding the SRO improperly reversed.  (See Support Memo at 8-13.)  She argues that, while the School District could not, or would not, identify a specific location of said instruction, it was understood that the instruction would occur during the school day, and not after school at I.M.'s home, as recommended in the May 2021 IEP.  (See id. at 9.)  Moreover, that recommendation failed to take into consideration alleged concerns

regarding fatigue I.M. suffered, especially in her efforts to read. (See id. at 10-11.)   Additionally, Plaintiff maintains that, as the IHO properly found, the School District's IEP failed to ensure I.M.'s required special reading instructions would be provided via the recommended Wilson reading methodology or by instructors properly certified in that methodology.   (See id. at 11-12.)   Yet, according to Plaintiff, "[s]chool districts do not have 'carte blanche' to assign placements 'that cannot satisfy the IEP's requirements."   (Id. at 12 (quoting T.Y. v. N.Y.S. Dep't of Educ., 584 F.3d 412, 420 (2d Cir. 2009)).)

### ii.   As to Appropriate Class Recommendation

Plaintiff challenges the decision of the IHO, affirmed by the SRO, "that the recommendation of a 15:1+1 class 'coupled with supports' such as a 1:1 aide could make up for the [School] District's failure to recommend a sufficiently small class for I.M."   (Support Memo at 13.)   She contends the School District's witnesses did not "explain how a 15:1:1 setting could meet I.M.'s unique needs when she had regressed in similar programs in the District, yet was progressing in VSS's smaller classes."   (Id. at 14.)   Relying upon a case from the Southern District of New York, Plaintiff also argues such a class is "particularly ill equipped to address I.M.'s dyslexia" and "inconsistent with an offer of [a] FAPE."   (Id. (discussing Avaras v. Clarkstown Cent. Sch. Dist., No. 15-CV-2042, at *19 (S.D.N.Y. July 17, 2017)).)

Plaintiff would have the School District's recommendation of a 1:1 aide discounted, asserting this component of its recommendation cannot cure the deficient class-size recommendation. (See id.)  According to Parent, "[a] 1:1 aide is a highly restrictive intervention that [would not be] necessary for I.M. in an appropriate-sized class and program, and would decrease I.M.'s independence rather than maximizing it."  (Id. (emphasis in original).)  To underscore this, Plaintiff asserts I.M. did not require a 1:1 aide in her smaller class at VSS, where she received "intensive support when needed while still working on improving her independence".  (See id.; id. at 15.)  She also maintains the School District's expert "opposed the provision of a 1:1 aide for I.M."  (Id. at 14-15 (citing IHO Hr'g Tr. 212).)  Thus, given the testimony opposing a 1:1 aide for I.M. and that it "would distract I.M. from learning rather than help", placing I.M. in a 15:1:1 special class, with a 1:1 aide was an inappropriate recommendation.  (See id. at 15.)

### iii. As to Lack of Appropriate Peers

Parent asserts the SRO disregarded the IHO's proper finding that I.M. would not have appropriate peers if placed in the School District's 15:1+1 special class and, in doing so, overruled the IHO's implicit credibility determinations regarding the School District's witnesses.  (See Support Memo at 15-16.)  She complains, inter alia, that the only School District witness

with knowledge of the proposed class, had no knowledge of I.M. or of functional grouping. (See id.) Further, Plaintiff maintains, "[t]he IHO properly determined that [School] 'District witnesses lacked knowledge of the class profile in the [proposed placement school]'". (Id. at 16.) Conversely, she argues, the SRO erred in concluding Parent's objections to the class group were "inherently speculative" where I.M. had not yet attended the proposed program since, according to Second Circuit case law, "concerns regarding access to . . . functional grouping were not speculative." (Id. (quoting J.S. v. N.Y.C. Dep't of Educ., 104 F. Supp. 3d 392, 413 (S.D.N.Y.), aff'd, 648 F. App'x 96 (2d Cir. 2016)).)

### iv. As to Appropriate Related Services

Plaintiff maintains both the IHO and SRO erred in not finding the School District's failure to recommend appropriate OT for I.M., i.e., twice weekly 40-minute individualized sessions of OT (versus the recommended weekly instruction consisting of one 30-minute individualized session and one 30-minute group session), contributed to denying I.M. a FAPE. (See Support Memo at 17.) The Parent claims longer, individualized OT was imperative "for I.M.'s learning in order to improve her writing and attending" and to allow her "to work at her own pace", as well as "to accommodate her need for movement breaks and transitions, and to address her attentional deficits." (Id.)

v.   <u>As to APE</u>

Plaintiff challenges the SRO's non-consideration of the IHO's finding regarding APE for I.M., <u>i.e.</u>, that inclusion of APE for I.M. "was more a function of what was available as opposed to what [I.M.] needed to be successful" (IHO Decision at 22), and therefore an inappropriate basis for the School District's IEP. (<u>See</u> Support Memo at 17-18.)  She argues the SRO was wrong not to consider this argument, upon the rationale that Plaintiff had not raise that issue in her IDEA Complaint, since the School District had introduced an exhibit at the underlying IHO Hearing which reflected I.M. would receive APE.  (<u>See</u> <u>id.</u> at 18.)  Moreover, according to Plaintiff, Second Circuit law instructs "the waive rule is not to be mechanically applied."  (<u>Id.</u> (citing <u>F.L.</u>, 274 F. Supp. 3d at 114).)

vi.   <u>As to Parent's Meaningful Participation</u>

Parent contends, although she made numerous requests that the School District consider continuing I.M.'s placement at VSS, "the [School] District never considered that option (or any similar one) with an open mind."  (Support Memo at 19; <u>see also</u> <u>id.</u> at 20.)  According to her, the School District's placement recommendation was driven solely by its non-availability of a smaller sized class for those on an academic track, like I.M., as opposed to a life-skills track.  (<u>See</u> <u>id.</u>)  Parent further asserts that no deference is due the SRO's conclusion that the School

District did not predetermine I.M.'s placement because such determination is not a matter requiring educational expertise. (See id. (quoting A.K. v. Westhampton Beach Sch. Dist., No. 17-CV-0866, 2021 WL 621236, at *14 (E.D.N.Y. Jan. 6, 2022), report and recommendation adopted sub nom., Killoran v. Westhampton Beach Sch. Dist., 2021 WL 665277 (E.D.N.Y. Jan. 25, 2022)).)

### vii. As to I.M.'s Social and Emotional Needs

Parent asserts the School District failed to assess I.M. regarding her social and emotional needs even though it intended to have her "transition into a much less supportive environment." (Support Memo at 20.)  She would fault the SRO for his conclusion that I.M.'s "social-emotional success at VSS . . . meant that [I.M.] would not face social[-]emotional difficulties in the substantially different District program." (Id. at 21 (citing SRO Decision at 27).)  She also implies the School District's alleged unawareness that I.M.'s emotional needs required monitoring is disingenuous given that the N.Y.S. Education Department "has noted that students like I.M. with dyslexia are at increased 'risk of anxiety, depression, low self-esteem and peer rejection.'" (Id. (without citation).)  Parent baldly concludes that, "[w]ithout an appropriate BIP in place, especially in a significantly larger classroom than she was attending, I.M. would have regressed emotionally, behaviorally, and educationally." (Id.)

viii.    <u>As to Appropriate Goals Development</u>

Without any meaningful elaboration, Plaintiff contends several of the School District's proposed goals for I.M. were inappropriate because either I.M. had already mastered them or they were too advanced. (<u>See</u> Support Memo at 22.) Accordingly to Parent: "At the January 2022 CSE, the [School] District adopted several of VSS's Goals, representing an awareness that its original Goals were fatally flawed." (<u>Id.</u> (citing IHO Hr'g Tr. 493).) In conclusory fashion, she also argues the School "District failed to sustain its burden to prove its Goals were appropriate" since "[n]one of its witnesses testified or explained at hearing how its Goals would be appropriate for I.M." (<u>Id.</u>)

b.    <u>The Appropriateness of VSS</u>

Highlighting that "[a] private placement need not meet the IDEA requirement for a FAPE," <u>R.E. v. N.Y.C. Dep't of Educ.,</u> 694 F.3d 167, 187 n.3 (2d Cir. 2012), Plaintiff contends the "IHO properly found VSS appropriate for I.M. and that I.M. progressed there." (Support Memo at 23.) She also accurately states the SRO did not rule on this issue. (<u>See id.</u>) Nonetheless, claiming "[t]he IHO's determination that VSS appropriately met I.M.'s needs is well supported by the record," Plaintiff asserts the IHO's order directing the School District reimburse to her the cost of the VSS tuition and related transportation expenses incurred should be upheld. (<u>Id.</u>)

c.    The Equities

Relying upon the Second Circuit's M.H. case, Parent asserts the IHO correctly found the relevant equitable considerations weighed in her favor, i.e., Parent "had participated in CSE meeting for I.M. and cooperated in all aspects of the CSE process, including raising her concerns at CSE meetings." (Support Memo at 24 (quoting M.H., 685 F.3d at 25).) For example, Parent: complied with the School District's requests to evaluate I.M.; visited the proposed placement site; provided timely notice of her intention to place I.M. at VSS and seek tuition reimbursement; notified the School District of her concerns about I.M.'s education; and, permitted VSS to share relevant reports regarding I.M. with the School District. (See id.)  Moreover, Parent contents the IHO properly found her testimony was credible that she had considered I.M.'s placement recommended by the School District notwithstanding her having signed a contract with VSS.  (See id.)  In sum, according to Plaintiff, "[t]he IHO's Decision concerning the equities [was] well supported by the record and should not be disturbed, especially as the SRO made no [such] findings here." (Id.)

2.    The School District's Position

Unsurprisingly, the School District believes the SRO Decision is the correct one and advocates for its being upheld. (See generally Opp'n.)  After articulating the relevant standard

of review (see id. at 2-5), it puts forth three points: the SRO
properly determined I.M.'s IEP provided her a FAPE (see id. at 5-
9); the Parent's placement of I.M. at VSS for the subject school
year was not appropriate given her unique educational needs (see
id. at 9-12); and, the equities of this case do not favor Plaintiff
such that reimbursement is warranted (see id. at 12-15).

   a. <u>The Applicable Standard of Review</u>

   In opposition, the School District first reminds the
Court that its review, while <u>de novo</u>, "is tinged with a significant
degree of deference" and is to be based upon the preponderance of
the evidence.  (Opp'n at 2 (quoting <u>P. ex rel. Mr. & Mrs. P. v.</u>
<u>Newington Bd. of Educ.</u>, 546 F.3d 111, 118 (2d Cir. 2008)).)  It
further states:

> In performing its review of the administrative
> decisions below, the inquiry before the Court
> is normally two-fold.  The Court must
> determine: (1) whether the District complied
> with the procedures set forth in the IDEA[;]
> and (2) whether the IEPs at issue were
> reasonably calculated to enable the student to
> receive educational benefits.

(<u>Id.</u> at 3 (citing <u>Bd. of Educ. of the Hendrick Hudson Cent. Sch.</u>
<u>Dist. v. Rowley</u>, 458 U.S. 176, 206-09 (1982)).)  In doing so, the
"Court must be careful not to substitute its own notions of sound
educational policy for those of the school authorities being
reviewed."  (<u>Id.</u> (citing <u>M.C. v. Voluntown Bd. of Educ.</u>, 226 F.3d
60, 66 (2d Cir. 2000)).)  The School District further elucidates

that, although a district court's review is not a mechanism to rubber-stamp a SRO's decision, the court "is required to give deference to that decision, particularly when, as in the instant case, the SRO ruling below reflects a thorough and careful review of the record by the SRO." (Id. at 4 (citing Cerra, 427 F.3d at 191-92, and 196).)

              b.   The SRO Decision Should be Upheld

Next, the School District contends the SRO Decision is correct, i.e., that, based upon the full record evidence:

> the CSE's recommendations for 2021-2022 school year were appropriate to meet the Student's needs, in light of the multiple supports, modifications, and individualized aspects of the placement and program recommendation coupled with the totality of the evaluative information available to the May 2021, September 2021[,] and January 2022 CSEs that supported their recommendations.

(Opp'n at 5; see also id. at 6 (identifying the CSEs' reliance upon "a February 2021 psycho-educational evaluation, reading evaluation, occupational evaluation[,] and anecdotal information from [VSS] as a basis for determining the [S]tudent's needs and recommending an educational program for the [S]tudent).) In contrast, the School District contends the IHO failed to consider the full scope of record evidence, thereby rendering a flawed decision. (See id. at 5.) The School District further argues the CSEs' deviation from "standard practices", i.e., recommending goals based upon a specific reading instruction methodology,

evinces the School District's proper placement of I.M. in "an appropriate self-contained class setting, with a specialized program focused on addressing her learning disabilities and providing evidence-based reading instruction." (Id. at 6.)

The School District summarily agrees with the IHO's decision there was not a sufficient basis for an FBA or BIP, which the SRO determined was, in any event, beyond the scope of the IHO's review authority since the Parent did not sufficiently challenge its absence. (See id. (citing IDEA Complaint).) Similarly, as to the IHO's determination regarding the IEP's APE recommendation, i.e., said recommendation was inappropriate for I.M. and, thereby constituted a denial a FPE, the School District merely states, because not raised in the Parent's IDEA Complaint, it was beyond the scope of the IHO's purview, which is what the SRO concluded. (See id.; see also SRO Decision at 13-14.)

Furthermore, the School District takes the position the IHO's finding that "the deficiencies in providing specialized reading support during the school day, the insufficient class profile knowledge base for the CSE's recommendation[,] and the inappropriate placement of the Student in Adaptative Physical Education constitute a denial of a FAPE" (IHO Decision at 24) was "unsupported by the record." (Opp'n at 7.) The School District also disagreed with the IHO's determination that "it remained unclear . . . whether the [School] District could have delivered

Wilson reading instruction with certified instructors in the group specialized reading instruction" (IHO Decision at 22), which, in any event, was "based upon inappropriate speculation." (Opp'n at 7.) However, "[s]peculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement." (Id. (quoting R.B. v. N.Y.C. Dep't of Educ., 603 F. App'x 36, 40 (2d Cir. Mar. 19, 2015)).)

The School District also would fault the IHO for not properly considering the September CSE recommendation since the IHO incorrectly determined said CSE made "no significant program changes to the Student's IEP", which it contends is not the case. (Id. (quoting IHO Decision at 12 and IHO Hr'g Tr. at 125).) According to the School District, the IHO did the same regarding the January 2022 CSE; he failed to adequately consider it. (See id. at 7-8.) The School District relies upon the Second Circuit's R.E. case to support its position that the IHO's non-consideration of these CSEs was improper. (See id. at 8 (quoting R.E., 694 F.3d at 187-88).)

c.   VSS Was Not an Appropriate Placement

Although the SRO found it unnecessary to examine whether I.M.'s unilateral placement at VSS by her Parent was appropriate, the School District contends the IHO's finding in that regard is not supported by the evidence. (See Opp'n at 9 ("[T]he hearing record contains minimal evidence regarding the Student's

performance at [VSS].").)  "[R]ather[,] the testimony from [VSS] witnesses were merely a generalized description of the program and strategies which fail to establish how [VSS] appropriately addressed the Student's unique needs." (Id.)  Indeed, the evidence presented was not relevant to the subject school year and VSS "failed to provide any updated testing or data to demonstrate the Student's progress." (Id. (citing IHO Decision at 24-25; further citation omitted); see also id. at 11 (stating VSS "failed to produce any meaningful data regarding the provision of services, including failure to provide the Wilson End of Step Assessment Reports").)  The School District would further fault the IHO for not considering the testimony of its experts, who provided evidence of the School District's ability to provide appropriate specialized reading instructions to I.M.  (See id. at 10-11.) Moreover, it challenges whether VSS "provided the Student with instruction with fidelity to the necessary components of" the Wilson and S.P.I.R.E. reading programs VSS utilized. (See id. at 10.)  Finally, the School District asserts the IHO failed to properly consider and weigh the restrictiveness of VSS when determining whether placement there was appropriate to meet the Student's educational needs.  (See id. at 11.)  Under Second Circuit precedent, that is a factor to be considered when determining whether a parent is entitled to an award of tuition reimbursement.  (See id. (citing C.L. v. Scarsdale Union Free

Sch. Dist., 744 F.3d 826, 836 (2d Cir. 2014)).)   The School
District maintains the record demonstrates VSS was overly
restrictive: it is very small, with less than 60 students for the
subject school year; it is comprised only of students with
disabilities; there were only ten students in I.M.'s grade; and,
because I.M. lives more than 50 miles from VSS, she was precluded
from interacting with peers who were nondisabled both during and
after the school day.  (See id. at 11-12.)  Hence, the School
District argues, because "the totality of the evidence presented
in the hearing record shows that [VSS] failed to provide the
[S]tudent with specially designed instruction which addressed her
unique needs", tuition reimbursement is not warranted.  (Id. at
12.)

d.    The Equities Do Not Support Reimbursement

Lastly, the School District asserts Parent is not
entitled to tuition reimbursement because her request was not
timely. (See Opp'n at 13.)  More specifically, it argues:

> [A]t the May 2021 CSE meeting, the Parent
> failed to inform the [School] District that
> she was taking steps to unilaterally place the
> Student[,] and the Parent waited until August
> 16, 2021 to file her 10-day notice.  Despite
> the CSE convening on September 14, 2021 to
> consider the Parent's concerns, the Parent
> failed to reject this program recommendation
> until December 3, 2021[,] and filed the [IDEA
> C]omplaint on December 6, 2021, before the
> [School] District could schedule a resolution
> meeting and after she was contractually
> obligated to pay full tuition.

(Id. at 13.)  According to the School District, given this timeline and applicable case law, Plaintiff is precluded from receiving tuition reimbursement.  (See id. (citing A.H. v. N.Y.C. Dep't of Educ., 652 F. Supp. 2d 297, 312-13 (E.D.N.Y. 2009), and P.G. v. N.Y.C. Dep't of Educ., 959 F. Supp. 2d 499 (S.D.N.Y. 2013)).)

        The School District would further have this Court reject the IHO's finding that the Parent was credible when she indicated she would consider a public school placement even though she had already signed a contract with VSS for I.M.'s 2021-2022 school year.  (See id. at 14 (quoting IHO Decision at 26).)  It argues said finding is unsupported by the record, especially since Parent did not take timely action in notifying the School District before her obligation to pay tuition to VSS was affirmatively triggered. (See id. at 14.)

        Additionally, the School District asserts Parent "did not adequately cooperate with the CSE as she did not provide any documents from [VSS] to the CSE in preparation of any of the respective meetings."  (See id.)  Nor, according to the School District, is there any record evidence supporting the IHO's finding that Parent and VSS continually raised concerns at each of the CSE meetings that the recommended class was too big; instead, the evidence shows: VSS "witnesses had no specific recollection of raising their concerns with the [School] District program

recommendation", <u>i.e.</u>, "none of these concerns were actually expressed to the CSE during the meetings"; and, "the Parent conceded that she never raised any concerns regarding the data or information considered by the District at CSE meetings" or "with the results of the District's psychoeducational evaluation, reading evaluation, [or] occupational therapy until the filing of the [IDEA C]omplaint." (<u>Id.</u> at 14-15.) As such, equitable factors weigh against awarding Parent tuition reimbursement. (See <u>id.</u> at 15.)

    B.    The Court's Ruling

        In making its ruling in this case, the Court applies the <u>Burlington/Carter</u> test.  See <u>GB v. N.Y.C. Dep't of Educ.,</u> 145 F. Supp. 3d 230, 243 (S.D.N.Y. 2015).  Under this test, the School District will be required to pay for the VSS tuition "only if: (1) the program recommended by the IEP was inadequate or inappropriate; (2) the alternative placement the Parent[] chose[s] was appropriate; and (3) the equitable factors weigh in favor of reimbursement."  <u>Id.</u> at 244 (citing <u>Carter</u>, 510 U.S. at 12-16; <u>Burlington</u>, 471 U.S. at 373-74; further citation omitted); <u>see also C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.,</u> 746 F.3d 68, 73 (2d Cir. 2014); <u>C.D. v. N.Y.C. Dep't of Educ.,</u> No. 15-CV-2177, 2016 WL 3453649, at *11 (E.D.N.Y. June 20, 2016).

1.    Prong I of the *Burlington/Carter* Test

"The first prong of the Burlington-Carter test requires a court to review both the procedural and substantive adequacy of the underlying decision." GB, 145 F. Supp. 3d at 244 (citing R.E., 694 F.3d at 189-90); see also J.S., 104 F. Supp. 3d at 401 (same). The Court turns first to the Parent's procedural challenges, and then her substantive challenges. See id. at 245.

a.    Procedural Challenges

A court must determine "whether the state has complied with the procedures set forth in the IDEA." T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 252 (2d Cir. 2009); see also Cerra, 427 F.3d at 192 (same).

> Not every procedural error in the development of an IEP renders that IEP inadequate. Grim [v. Rhinebeck Cent. Sch. Dist.], 346 F.3d [377,] 381-82 [(2d Cir. 2003)]. "Only procedural inadequacies that cause substantive harm to the child or his parents— meaning that they individually or cumulatively result in the loss of educational opportunity or seriously infringe on a parent's participation in the creation or formulation of the IEP—constitute a denial of a FAPE." Matrejek v. Brewster Cent. Sch. Dist., 471 F. Supp. 2d 415, 419 (S.D.N.Y. 2007), aff'd, 293 [F. App'x] 20 (2d Cir. 2008).

C.D., 2016 WL 3453649, at *12; see also R.E., 694 F.3d at 190 ("Multiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not."). "Procedural violations entitle the parents to

Page 51 of 80

reimbursement 'only if they [1] 'impeded the child's right to a FAPE,' [2] 'significantly impeded the parents' opportunity to participate in the decision-making process,' or [3] 'caused a deprivation of educational benefits.''" GB, 145 F. Supp. 3d at 244 (quoting M.W., 725 F.3d 131 (2d Cir. 2013); further citation omitted); see also 20 U.S.C. § 1415(f)(3)(E)(ii). Parent asserts two procedural-based arguments: first, she was denied meaningful participation in the development of I.M.'s IEP; and, second, no FBA was conducted and no BIP was developed.

### i. Lack of Meaningful Participation

Upon the record presented, Parent's assertion that she was denied meaningful participation in the development of I.M.'s IEP is unavailing. As in C.D., here, "[n]either the IHO nor the SRO found that the [Parent[] w[as] denied meaningful participation." C.D., 2016 WL 3453649, at *12. First, in his decision, the IHO stated simply that Parent "participated in all the CSE meetings regarding her daughter." (IHO Decision at 14.) He did not make any finding that the School District failed to consider the Parent's concerns. Then, in a more fulsome manner, the SRO explained: (i) the Parent's full participation in the CSEs; (ii) in response to Parent's August 2021 and December 2021 letters, the CSE reconvened to respond to Parent's concerns; and, (iii) at the IHO Hearing, Parent testified, inter alia, that she was "given the opportunity to discuss the [S]tudent's evaluations" and was

able to raise her concerns about various School District recommendations. (See SRO Decision at 16-17.) Further, recognizing as understandable the Parent's preference that Student remain at VSS, the SRO stated the School District "was not required to consider placement of the [S]tudent in a nonpublic school once it determined that a less restrictive placement was appropriate to address the [Student's needs." (Id. at 17.) Of significance, the SRO concluded: "Although the hearing record reflects parental disagreement with the [S]chool [D]istrict's proposed IEP and placement recommendation[,] that does not amount to a denial of the [P]arent's meaningful participation in the development of the program"; indeed, the SRO determined the IHO Hearing record failed to support either the Parent's claim of predetermination or prevention of participation. (Id.)

"This [C]ourt sees no reason to disturb the finding of both the IHO and SRO that the [P]aren't[] w[as] able to meaningfully participate in developing the IEP." C.D., 2016 WL 3453649, at *13. Like the SRO, the Court rejects Parent's reliance upon her August 2021 and December 2021 letters to the School District to establish her claim since, as the SRO observed, they were the impetus for the CSE to be reconvened twice. (See Support Memo at 19 (citing Exs. P-11 & P-12).) Similarly, Parent's citation to the IHO Hearing transcript in support of her procedural claims fail to carry her burden. (See id. (citing IHO Hr'g Tr. at

66, 81).)  Page 66 contains testimony from the chairperson of the CSE testifying about the appropriate options considered for I.M.'s placement.   Page 81 contains the CSE chairperson's general testimony regarding the reconvened September 2021 CSE meeting in response to Parent's August 2021 letter and inviting VSS staff to comment on the School District's responses to same.  If anything, the proffered testimony underscores Parent's participation.

ii. Failure to Conduct FBA or Develop BIP

In her moving papers, Plaintiff presents this argument as the CSE failing to assess I.M.'s social and emotional needs. That claim logically leads to the purported failure to conduct a FBA and develop an appropriate BIP.  With that context, the Court proceeds to consider Plaintiff's argument.

> Under New York regulations, a CSE must, "in the case of a student whose behavior impedes his or her learning or that of others, consider strategies, including positive behavioral interventions, and supports and other strategies to address that behavior." 8 NYCRR § 200.4(b)(3)(i).  These strategies include an FBA, which is "the process of determining why a student engages in behaviors that impede learning and how the student's behavior relates to the environment."  Id., § 200.1(r).  FBAs are conducted "as necessary to ascertain the physical, mental, behavioral and emotional factors which contribute to the suspected      disabilities."       Id. § 200.4(b)(1)(v).   An FBA must include an "identification of the problem behavior" and "the formulation of a hypothesis regarding the general conditions under which [the] behavior usually occurs."  Id. § 200.1(r).  Where the student's behavior impedes his learning or

that of his peers, the CSE should create a BIP
that sets out "intervention strategies to be
used to alter antecedent events to prevent the
occurrence of the behavior, teach individual
alternative and adaptive behaviors to the
student, and provide consequences for the
targeted inappropriate behavior(s) and
alternative acceptable behavior(s)." Id.
§ 200.22(b)(4)(ii).

Notwithstanding those requirements, the
case law is clear that "a failure to conduct
an FBA . . . does not rise to the level of a
denial of a FAPE if the IEP adequately
identifies the problem behavior and prescribes
ways to manage it." R.E., 694 F.3d at 190;
see also A.C., 553 F.3d at 172 (failure to
perform FBA did not render IEP legally
inadequate in light of IEP's provision of
strategies to address child's behavior); T.Y.,
584 F.3d at 419 ("substantial evidence in the
record" of ways to address problematic
behaviors provided basis for SRO to conclude
that, despite failure to conduct a FBA or a
BIP, a FAPE was not denied).

GB, 145 F. Supp. 3d at 251–52.

Here, "[a]pplying these standards to the record
evidence, the IHO's and SRO's finding that the lack of an FBA and
BIP did not deny [I.M.] a FAPE is persuasive and merits deference."
J.S., 104 F. Supp.3d at 405; see also GB, 145 F. Supp. 3d at 252
("Applying these standard to the evidence in the hearing record,
the SRO's finding on this issue is again deserving of deference.").
Indeed, there was no record evidence that I.M. "engage[d] in the
types of disruptive behavior that require[s] an FBA or BIP." GB,
145 F. Supp. 3d at 252. Rather, the December 2019 Report upon
which Parent relies in putting forth her social-and-emotion-needs

argument is unavailing since: it did not establish I.M. "meet the criteria for any anxiety or depressive disorder" (SRO Decision at 26 (quoting December 2019 Report)); it was not among the evaluative information considered by the May 2021 CSE; and, significantly, Parent did not "assert a claim that she requested consideration of that evaluation report and the CSE failed to consider it." (Id.) Further, there was record evidence showing I.M. did not display social or emotional issues; Parent reported her daughter was a "social butterfly", and the VSS staff providing feedback that I.M. did not present with behaviors impeding to her learning or the learning of others. (See id. at 27.) "Where there is no evidence that a student's behavior interfered with his or another student's ability to learn, the CSE is not required to conduct an FBA or BIP." GB, 145 F. Supp. 3d at 252 (citing J.S., 104 F. Supp. 3d at 405-06)). As such, "the Court therefore agrees with the IHO's and SRO's conclusion that [I.M.]'s behavior did not interfere with h[er] learning to the extent that the CSE was required to conduct an FBA." J.S., 104 F. Supp. 3d at 406

Finally, as the SRO further explained, the May 2021 CSE also: "developed a social/emotional annual goal and recommended supports and other strategies to address behaviors"; recommended twice monthly counseling for I.M.; and, recommended a 1:1 aide to support I.M. during instructional time, thereby assisting in I.M.'s transition back into a different school setting. (Id.)

"Where, as here, a student's 'behaviors were well-known and were discussed at the CSE meeting,' 'the failure to conduct an FBA [does] not rise to level of denial of a FAPE' so long as the IEP contains adequate strategies for managing those behaviors." J.S., 104 F. Supp. 3d at 407 (quoting P.L. v. N.Y. Dep't of Educ., 56 F. Supp. 3d 147, 161-62 (E.D.N.Y. 2014)).   Moreover, Parent's contention that "[w]ithout an appropriate BIP in place, especially in a significantly larger classroom than she was attending, I.M. would have regressed emotionally, behaviorally, and educationally" (Support Memo at 21), is little more speculation.   In any event, the purported inadequacy in I.M.'s IEP caused by a lack of an FBA or BIP was rectified—or "rescued"—by the inclusion of the components identified by the SRO.   Cf. id. at 408 (finding "the SRO reasonably, and in the Court's view correctly, concluded that the 'recommended strategies to address the student's management needs, as well as additional teacher supports, ICT services, and the annual goals in the [subject] IEP rescued any inadequacy")).

b.   Substantive Challenges

As Judge Ross of this District has explained:

A school district complies with the substantive provisions of the IDEA when it provides a disabled child with an IEP that is "reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 207.   A school district is not, however, required to furnish "every special service necessary to maximize each handicapped child's potential," id. at 199, or to provide

"everything that might be thought desirable by loving parents," Walczak, 142 F.3d at 132 (internal quotation marks and citations omitted). "Rather, a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression,' and if the IEP affords the student with an opportunity greater than mere 'trivial advancement.'" Cerra, 427 F.3d at 195 (quoting Walczak, 142 F.3d at 130). Therefore, "a court may not second-guess state educators' policy decisions in the effort to maximize a handicapped child's educational potential." Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1121 (2d Cir. 1997); see also Rowley, 458 U.S. at 208 ("[O]nce a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States."). In order to avoid "impermissible meddling in state educational methodology," a federal court reviewing the adequacy of an IEP "must examine the record for any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan." Walczak, 142 F.3d at 130 (internal quotation marks and citations omitted).

C.D., 2016 WL 3453649, at *13; see also F.L., 274 F. Supp. 3d at 119 ("In analyzing an IEP's substantive adequacy, courts review 'the record for objective evidence that indicates whether the child is likely to make progress or regress under the proposed plan.'" (quoting Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 113 (2d Cir. 2007))); GB, 145 F. Supp. 3d at 249. If substantive inadequacy is found, a parent is "automatically entitle[d] . . . to reimbursement." R.E., 694 F.3d at 190.

Plaintiff's substantive challenges regard: (i) reading services; (ii) class recommendation; (iii) appropriate peers; (iv) related services; (v) APE; and (vi) goals development. The Court address each, in turn.

i. <u>Reading Services</u>

<u>As to Purported Retrospective Testimony</u>: To the extent Parent challenges I.M.'s IEP based upon the Circuit's prohibition on retrospective testimony from school districts regarding additional services being provided "beyond those listed in the IEP", in this instance, that reliance is misplaced. <u>See</u> R.E., 694 F.3d at 186; (<u>cf.</u> Support Memo at 8-9). That is so because the Second Circuit rejected "a rigid 'four corners' rule prohibiting testimony that goes beyond the face of the IEP." <u>Id.</u>; <u>see also id.</u> at 195 ("[W]e reject a rigid 'four-corners rule' that would prevent a court from considering evidence explicating the written terms of the IEP."). Hence, "[w]hile testimony that materially alters the written plan is not permitted, testimony may be received that explains or justifies the services listed in the IEP." <u>Id.</u> (citing <u>D.S. v. Bayonne Bd. of Educ.</u>, 602 F.3d 553, 564-65 (3d Cir. 2010) ("[A] court should determine the appropriateness of an IEP as of the time it was made, and should use evidence acquired subsequently to the creation of an IEP only to evaluate the reasonableness of the school district's decisions at the time they were made.")); <u>see also</u> <u>K.R. ex rel. Matthew R. v. N.Y.C. Dep't of</u>

Educ., 107 F. Supp. 3d 295, 302 (S.D.N.Y. 2015) ("[W]hile the IEP must be evaluated prospectively and cannot be altered by retrospective testimony about what a school district might have done, testimony explaining how the IEP would be implemented is sufficiently prospective and may be considered by the Court."). Thus, "[t]he appropriate inquiry is into the nature of the program actually offered in the written plan." Id. at 187 (emphasis added). Here, the testimony proffered did not go beyond the Subject IEP; rather, it was presented to explain the nature of said IEP and to justify the locations identified for I.M.'s individualized reading instructions, e.g., delineating "special location" for specialized reading instruction "was to give providers flexibility in where they could provide the service". (SRO Decision at 32.)

As to Specification of Location of Services: The SRO recognized a failure to be specific with identifying the location of services can be a procedural violation. (Id. (citations omitted).) Although not explicitly stated, given the SRO's subsequent discussion, it is readily apparent that—having thoroughly reviewed the underlying record—the SRO found no such procedural inadequacy. For example, the record evidence showed, at the May 2021 CSE in which Parent participated, there was discussion about providing I.M.'s specialized reading services after school. (See IHO Hr'g Tr. 72-75.) Further, the May 2021

IEP identified "home" as the location where I.M.'s summer specialized reading services would be provided. (See SRO Decision at 32 (citing Subject IEP).) The SRO also underscored Parent was informed via the School District's May 2021 Prior Written Notice that the CSE recommended individualized specialized reading instruction at home and group specialized reading instruction at school. (See SRO Decision at 32 (citing May 18, 2021 Prior Written Notice, Ex. D-5).) Additionally, the SRO astutely explained, with adequate support for same, why the School District's recommendation of providing the Student's individualized specialized reading after-school comported with providing I.M. a FAPE. (See SRO Decision at 31-32.) Finally, the SRO acknowledged staff from VSS testified regarding their belief that after-school reading instruction for I.M. would cause her to be fatigued. (See id. (citing IHO Hr'g Tr. at 360-61, 368, 524-25).) However, said testimony evinces it was not clear that staff concerns were vocalized during the CSE meeting. As the SRO stated: "Certainly, these are concerns that should have been discussed at the May 2021 CSE meeting . . . ; yet, there is no indication that these concerns were raised at the meeting or otherwise communicated to the [School D]istrict." (Id. at 32-33.) Parent has failed to demonstrate that this was not the case.[8] Given the SRO's well-reasoned

---

[8]  Parent's argument that the SRO "incorrectly claimed [Parent] did not communicate concerns regarding I.M.'s reading fatigue" to

the School District fails. (Support Memo at 11.) In support of that position, Parent stated the School District "discussed Ms. Micali's report, which expressed concerns about I.M.'s reading fatigue, at multiple CSE meetings." (Id. (citing Da Vinci Evaluation Report, Ex. D-2, at 11; May 2021 Prior Written Notice, Ex. D-5, at 2; and May 2021 IEP at 1).) The cited evidence shows the School District was aware I.M. could fatigue in her reading efforts; it does not show Parent communicated her concerns regarding the fatigue factor to the School District. Quite simply, those are two unrelated issues. At bottom, Parent has not establish by a preponderance of the evidence that the SRO's conclusion in this regard was incorrect. See, e.g., M.H., 250 F. App'x at 430.

Further, the Court is unpersuaded by Parent's contention that the School District's identification of a "special location" means "within the school day"; such an argument is little more than a bald leap unsupported by her citation to the record. (Support Memo at 8 (citing IHO Hr'g Tr. at 73-75, and May 2021 IEP at 25).) And, Parent's reliance upon the testimony of the School District's classroom teacher, Madeline Egan, does not support her position about the meaning of "special location"; at best it is a mischaracterization. (See id.) Egan testified that, during the September 2021 CSE and because of concern that I.M. "was having specialized reading after school", there was discussion about how to provide I.M. her specialized reading services during the school day. (See id. (citing IHO Hr'g Tr. at 306); see also IHO Hr'g Tr. at 305.) If anything, said testimony demonstrates it was sufficiently clear to all parties involved in the development and implementation of I.M.'s IEP that the location for the provision of I.M.'s individualized specialized reading services would be after-school, in her home. As the SRO explained, inter alia, "location must be stated with sufficient clarity to be understood by all persons involved in the development and implementation of the IEP." (SRO Decision at 32 (quoting N.Y.S. Educ. Dep't IEP Guide)); see also, e.g., The University of the State of New York, The State Education Department: Guide to Quality Individualized Education Program (IEP) Development and Implementation (Feb. 2010 (revised Sept. 2023), available at https://www.nysed.gov/sites/default/files/programs/special-education/guide-to-quality-iep-development-and-implementation.pdf. The record evidence demonstrates that was the case here. Therefore, the SRO's determination on this issue is entitled to deference by this Court.

explanation, which was more thorough and carefully considered than that of the IHO, the Court defers to the SRO's conclusion that the School District's procedural violation in not being more specific with identifying the location of I.M.'s specialized reading services did not result in denying I.M. a FAPE.  See R.E., 694 F.3d at 189 (instructing where the IHO and SRO disagree, the general rule is that courts must defer to the reasoned conclusions of the SRO as the final state administrative determination (quotations and citation omitted)).

As to Instructors:  Parent maintains I.M.'s Subject IEP was inadequate because it was unclear whether the School District "could provide Wilson Reading instruction with certified instructors for I.M.'s group reading services." (Support Memo at 11-12.)  She also contends "[t]he [School] District's Goals were designed to be addressed via Wilson Reading methodology." (Id. at 12 (citing IHO Hr'g Tr. at 70, 312).)  Moreover, according to Parent, the teacher who was to provide I.M.'s group reading instruction was not properly certified; nor was the 15:1:1 special classroom teacher who would be partially responsible for implementing the Wilson goals for I.M.  (See id.)

Parent reads too much into the subject IEP.  In this case, the Wilson Reading methodology provided a relevant reference point from which to compose I.M.'s Subject IEP; however, the IEP did not mandate strict adherence to that methodology.  That is not

surprising since, as the SHO stated:  "In general, a CSE is not required to specify methodology on an IEP, and the precise teaching methodology to be used by a student's teacher is usually a matter to be left to the teacher's discretion—absent evidence that a specific methodology is necessary."  (SRO Decision at 33 (collecting cases).)  Indeed, the SRO aptly articulated, the CSE chairperson testified, <u>inter alia</u>:  the CSE discussed the Wilson Reading methodology; I.M.'s "goals were developed with Wilson-based reading instruction in mind because the CSE 'felt it necessary to capture [I.M.]'s present levels of performance in the program'"; and, for I.M., her IEP indicated she "should continue to participate in <u>an Orton Gillingham-based (O-G) program</u> to improve her sound-symbol association and syllable awareness for reading and spelling."  (SRO Decision at 33-34 (citations omitted; emphasis added).)  Moreover, the CSE chairperson further testified it was the School District's general practice not to reference a specific methodology or pedagogy an IEP.  (<u>Id.</u> at 33.)  Further, the CSE chairperson testified I.M.'s "classroom teacher and staff from Da R.E.GBVinci Collaborative would be responsible for implementing [I.M.]'s specialized reading mandate."  (<u>Id.</u> at 34.) Since applicable state regulations require remedial services included within an IEP to "be provided by appropriately certified or licensed individuals", the SRO determined the IHO's finding of an inadequate IEP, based upon the alleged uncertainty of the School

District to provide Wilson-certified instructors for group specialized reading instruction, to be untenable:

> In finding that the [School D]istrict did not prove that it could have provided the student with instruction provided by "certified instructors in the group specialized reading," the IHO did not reference any part of the hearing record indicating that the district's proposed reading instruction would not have been delivered by professionals with the certification required by State regulation to provide specially designed reading instruction (IHO Decision at p. 22; see Tr. pp. 158-59, 173, 179, 196). Rather, review of the hearing record shows that the [School D]istrict could have provided an instructor certified in the Wilson program for the individual reading instruction (Tr. pp. 172-74). Additionally, for the group instruction, the student would have received instruction through a special education teacher, although that teacher would not have been trained in Wilson (Tr. Pp. 178-79). According to State regulation, the proposed providers were properly licensed or certified to provide the student with specially designed reading instruction (see 8 NYCRR 200.6[b][1], [6]; Ganje v. Depew Union Free Sch. Dist., [No. 11-CV-0665,] 2012 WL 5473491, at *15 [W.D.N.Y. Sept. 26, 2012], adopted, 2012 WL 5473485 [W.D.N.Y. Nov. 9, 2012]).

(SRO Decision at 34.)  Therefore, the SRO overturned this finding. (See id.)

In opposing Parent's contention I.M. was denied a FAPE because the reading instructors were not Wilson-certified, the School District contends the IHO's certified-reading-instructor-based finding is speculative (see Opp'n at 7); given the SRO's

in-depth review of the evidence and legally based rationale for finding otherwise, the Court agrees.  The Second Circuit has instructed: "Speculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement." R.E., 694 F.3d at 195; R.B., 603 F. App'x at 40 (same).  Rather, "[a]n IEP need only be reasonably calculated to provide likely progress, and after reviewing the record, [this Court] conclude[s] that the SRO[, unlike the IHO,] had ample evidence to find that the IEP met this standard." Id. (citing Cerra, 427 F.3d at 195).  Hence, the Court defers to the SRO's determination.

        As to Plaintiff's General Argument:  Finally, Parent's arguments that the School "District's reading recommendations were designed solely to help the [School] District prevail at hearing" and that since said recommendations "were never intented to be implemented, [School] District staff could not clearly explain those recommendations" (Support Memo at 10) are unsupported and speculative.  As such, said arguments are inadequate to challenge the sufficiency of the Subject IEP or that I.M. was not provided a FAPE.  See, e.g., R.E., 694 F.3d at 195.

        In sum, because the SRO carefully considered the information presented to the CSE regarding I.M.'s reading needs at the time the Subject IEP was created, in conjunction with relevant regulations and guidelines, the SRO's decision deserves deference.

See <u>GB</u>, 145 F. Supp. 3d at 249, 250.   Accordingly, this Court defers to the SRO's sound decision regarding I.M.'s reading services.

ii.  <u>Class Recommendation</u>

Notwithstanding both the IHO and SRO determining I.M.'s recommended class side of 15:1:1, coupled with supports to address the Student's attention and distractibility issues, to be appropriate, Parent challenges same. (<u>Compare</u> IHO Decision at 21, and SRO Decision at 27-30, <u>with</u> Support Memo at 13.)  She relies predominantly upon an April 2018 neuropsychological evaluation of I.M. to support her contention that the recommended 15:1:1 class was too large for I.M.  (<u>See id.</u> at 14 (citing Ex. P-2).)  Such reliance is unavailing; while, perhaps, relevant to provide background information, it is stale in comparison to the then-contemporary information before the CSEs.  Moreover, said evidence fails to demonstrate by a preponderance of the evidence that the proffered Subject IEP was inadequate.  Rather, "the hearing record reflects that the [School D]istrict developed a comprehensive program to address the [S]tudent's needs, albeit in a larger 15: 1+ 1 special class [than preferred by Parent], and articulated appropriate reasons related to the [S]tudent's needs to recommend that the [S]tudent receive the support of a 1: 1 aide if she decided to transition back into the [School D]istrict schools." (SRO Decision at 30 (citing IHO Hr'g Tr. at 64-65; Ex. D-2 at 1;

May IEP at 25, 26).)  The SRO's well-reasoned and well-supported decision, which conforms with that of the IHO as to the recommended class size, warrants this Court's deference.  See J.S., 104 F. Supp. 3d at 409 ("Because the IHO and SRO have far more expertise that this Court, and reached the same conclusion about the appropriateness of the [subject class] recommendation, deference is due to the administrative officers." (citations omitted)).

To the extent Parent proffers Avaras v. Clarkstown in support of her assertion the District's 15:1:1 special class is ill-equipped to address I.M.'s dyslexia, the Court finds it without persuasion in this instance, since the facts of Avaras are inapposite to those presented here.  (See Support Memo at 14 (citing Avara, 2017 WL 3037402).)  In Avaras, the class being recommended was a 15:1 class setting, which ratio would not have permitted the level of direct interaction required for the student's reading instruction.  See Avara, 2017 WL 3037402, at *19.  By comparison, here, the recommended class size for I.M. was 15:1:1.  Based upon the record evidence in this case, the Court finds it appropriate to defer to the SRO's decision on this issue, i.e., "there is no reason to depart from the IHO's finding that the [School D]istrict's recommendation of a 15:1+1 special class with the additional support of a 1:1 aide were sufficient to meet [I.M.]'s needs and provide her with an educational benefit." (SRO Decision (citing IHO Decision at 20-21).)

And, for completeness, as to the recommendation regarding the aide, the Court finds purely speculative Plaintiff's assertion that "[i]t would be restrictive, regressive, and ostracizing to force I.M. into a program where she would struggle and require an aide." (Support Memo at 15.) Speculation does not suffice in establishing an IEP is inadequate. See, e.g., R.E., 694 F.3d at 195; see also, e.g., J.S., 104 F. Supp. 3d at 412 ("[T]he validity of the proposed placement cannot be evaluated using speculative evidence concerning how the IEP might have been implemented." (citation omitted)). Moreover, the adequacy of such an aide "is precisely the kind of educational policy judgment to which [courts] owe the state deference if it is supported by sufficient evidence." K.M. v. N.Y.C. Dep't of Educ., No. 13-CV-7719, 2015 WL 1442415, at *2 (S.D.N.Y. Mar. 30, 2015) (citing R.E., 694 F.3d at 192). That is the case here; "this portion of the SRO's decision was well-reasoned and . . . is owed deference as the final decision of the state." Id.; (see also SRO Decision at 29-30.)

### iii. Appropriate Peers

Plaintiff challenges the composition of the recommended 15:1:1 special class, which the CSE identified for Student's placement, and which the IHO found was not appropriate, but which the SRO found was appropriate. (See Support Memo at 15; see also IHO Decision at 21; SRO Decision at 34-37.) Once more, Plaintiff

asserts the School District improperly relied upon retrospective testimony to justify the recommended class placement. (See Support Memo at 16.) She further contends the School District's witness, Evaluator Micali, "testified that a 15:1:1 special class was not appropriate for I.M. . . . and she raised this with the CSE." (Id. (citing IHO Hr'g Tr. at 206-07).) Plaintiff maintains "[t]he IHO saw through the District witnesses' vague and generic claims that I.M. would have appropriate peer matches in the 15:1:1 special class." (Id. (citing IHO Decision at 21, and IHO Hr'g Tr. at 270-71).) She insists the SRO's contrary decision is erroneous. (See id. at 16-17.) Not so.

A simple comparison of the IHO's perfunctory rationale for his determination the School District's "witnesses lacked knowledge of the class profile" and "[a]bsent that information, the recommendation is flawed and inappropriate" (IHO Decision at 21), with the SRO's rigorous review of the record and applicable analysis (see SRO Decision at 35-37) demonstrates the SRO's determination on this issue should be sustained. The SRO meticulously described the record evidence supporting the recommended 15:1:1 special class:

> The principal of the assigned school site testified that she met with the [P]arent when she visited the school and shared with her that she was not able to answer the [P]arent's questions that pertained to specific students, their learning disability, or academic needs that could identify them, as she did not

believe it was appropriate to share that
information with the parent due to the privacy
rights of the students in the class (Tr. pp.
113, 119-20, 127). However, the principal
informed the [P]arent that at the time of her
visit there were eight students enrolled in
the 15: 1 +1 special class and regarding the
functioning level of the students enrolled in
the 15: 1 +1 special class, "there could be
various disabilities, but the students
had similar academic levels" (Tr. pp. 122, 123,
128-29). The principal further testified that
she informed the [P]arent what the students
would be working on, how the teachers would
differentiate instruction based on the
[S]tudent's needs, and that the school used a
Regents track curriculum that followed State
standards (Tr. pp. 121, 127). The principal
described the [S]tudent's teachers to the
[P]arent and informed her that she "was going
to make sure that [the Student] had a
[certified teaching assistant] . . . [who] was
also a certified teacher" to provide the
[S]tudent's 1:1 aide support (Tr. p. 121).

(SRO Decision at 36 (emphasis added).) Hence, in comparison to

the bare-bones explanation provided by the IHO (see IHO Decision

R 21), the record evidence highlighted by the SRO, and regarding

the composition of the recommended class, supports the SRO's

determination that the IHO erred in his determination on this

issue. Cf., e.g., K.R., 107 F. Supp. 3d at 312 (deferring to SRO's

decision where the weight of the evidence did not support IHO's

determinations regarding functional grouping).

    Additionally, review of Evaluator Micali's testimony

demonstrates Plaintiff mischaracterizes same; for example,

although Micali testified she had concerns with the recommended

placement of I.M., she also stated she "understood why the [CSE] committee was recommending a 15:1:1 in the school district . . . because [I.M.'s] skills were still so weak." (IHO Hr'g Tr. at 207.) Micali's concerns were based upon I.M.'s cognitive ability and her "savvy" social skills compared to the possible others in the class, of which she did not know. (See id. ("I worried about the makeup of the class. And, again, I don't know what that makeup of the class was, the 15:1:1.").) Like Parent, Micali's concerns were speculative.[9] As the SRO correctly determined, here "concerns about the likelihood that the [S]tudent would be appropriately grouped with other students are speculative given that the [S]tudent never attended the assigned public school site." (SRO Decision at 36 (collecting cases).) Moreover, as the SRO explained, "[T]he Second Circuit has held that the IDEA does 'not expressly require school districts to provide parents with class profiles.'" (Id. (quoting Cerra, 427 F.3d at 194; collecting cases).) The SRO elucidated that, because a school district cannot

---

[9]   The Court rejects Plaintiff's reliance on J.S.   (See Support Memo at 16.)   It is true the J.S. Court found the SRO erred in dismissing certain concerns voiced by the parents as speculative, but which the district court found were not speculative.   See J.S. 104 F. Supp. 3d at 412-13.   Nonetheless, the J.S. Court rejected the parents' generalized objections, because they were speculative, explaining that since the student had not attended the recommended school, the parents' "concerns about how the school might have implemented the IEP [we]re speculative." Id. at 412. Nor, contrary to Parent's suggestion, did the J.S. case deal with functional grouping. (Compare Support Memo at 16), with J.S., 104 F. Supp. 3d at 412-13.

guarantee the composition of the class a student will attend, claims regarding grouping are inherently speculative. (See SRO Decision at 36 (citing M.S. v. N.Y.C. Dep't of Educ., 2 F. Supp. 3d 311, 332 n.10 (E.D.N.Y. 2013); further citation omitted).) In any event, the School District was not required to offer I.M. "the best possible placement; it was required only to provide h[er] with an appropriate education." J.S., 104 F. Supp. 3d at 412; see also, e.g., R.C. ex rel. M.C. v. Byram Hills Sch. Dist., 906 F. Supp. 2d 256, 273 (S.D.N.Y. 2012) ("While it is natural to assume that a student would benefit from being in a smaller classroom environment with more support, the IDEA does not require that the [School] District provide an ideal learning environment, but instead only one where the student can progress."). Having reviewed the record, IHO Decision, and SRO Decision, the Court finds there was sufficient evidence to support the SRO's determination; further, the SRO Decision as to this matter is entitled to deference. See, e.g., Cerra, 427 F.3d at 195 ("In order to avoid impermissibly meddling in state educational methodology, a district court must examine the record for any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan." (cleaned up)); GB, 145 F. Supp. 3d at 249; see also F.L., 274 F. Supp. 3d at 119 (recognizing that, since "administrative agencies have special expertise in making judgments concerning student progress,

deference is particularly important when assessing an IEP's substantive adequacy").

### iv.  Related Services (OT)

Plaintiff contends the SRO was wrong to find the IHO's determination "that the [School D]istrict's recommendation of group OT was appropriate and that the [P]arent's concern that the [S]tudent could not succeed in a group setting was 'misplaced.'" (SRO Decision at 24; see also Support Memo at 17.)  She argues "[i]ndividual OT was critical for I.M.'s learning in order to improve her writing and attending" and it would be "impossible" for I.M. to receive the requisite individual attention in a group setting.  (See id.)  Parent contends her daughter's occupational therapist testified to that effect.  (See id. (citing IHO Hr'g Tr. at 553, 557, 562, 578).)  However, in light of the record evidence, Parent's mere disagreement with the recommended OT fails to establish I.M. was denied a FAPE.  See, e.g., F.L., 735 F. App'x at 40 (instructing a parent's disagreement with a CSE's recommendation does not constitute a denial of a FAPE).

Unlike the IHO's succinct explanation that the CSE's recommendation of group OT services to be appropriate for I.M. (see IHO Decision at 23), the SRO provided an exhaustive review of the relevant evidence and gave a methodical rationale for sustaining the IHO's determination.  (See SRO Decision at 24-25.)  The SRO's decision is well-worthy of deference.  See M.H., 685

F.3d at 244.  Indeed, the SRO thoroughly recounted the testimony of I.M.'s occupational therapist at VSS, as well as underscored said therapist did not correct information in the School District's February 2021 OT evaluation report (hereafter, the "School OT Report") indicating I.M. received both weekly individual and group OT sessions, and did recognize the final decision regarding delivery of OT services was at the discretion of the CSE.  (See id. at 25.)  At bottom, the SRO found nothing in the School OT Report indicated I.M.'s OT needs "could only be met during individual sessions"; instead, "the evidence in the hearing record indicated that the [S]tudent was very social and needed to work on improving attending and independent work completion, needs which could be addressed in a small group setting."  Plaintiff has failed to show this is not the case; nor does the Court find it to be so. Therefore, the Court defers to the SRO's decision.

v.   APE

Plaintiff's challenge of the Student's IEP based upon the inclusion of APE in the Student's proposed 2021-2022 class schedule is disingenuous.  First, the Parent's IDEA Complaint did not challenge any recommendation regarding APE.  (See SRO Decision at 13 (citing Ex. P-1).)  As such, it was beyond the scope of the impartial hearing and, thus, beyond the scope of this Court's review.  See R.E., 694 F.3d at 187-88.  And, as the SRO explained in detail, the "open door" exception is inapplicable in this

instance.  (See SRO Decision at 14 (stating, inter alia, "hearing record indicates that no [School D]istrict witnesses testified about the [APE] issue[;] it arose during the [P]arent's case in chief, and the [School D]istrict did not open the door to the [Parent's challenge").)  Since the APE issue was beyond the  scope of the hearing, the SRO reversed that finding.  (See id. (citing B.P., 841 F. Supp. 2d at 611 (explaining "scope of the inquiry of the IHO, and therefore the SRO . . . , is limited to matters either raised in the . . . impartial hearing request or agreed to by [the opposing party]")).)

Second, the SRO noted, even if the APE issue had been properly raised, the IHO's determination on same would require reversal.  (See SRO Decision at note 7.)  Quite simply, the APE recommendation was not even included in the May 2021 IEP, but was mistakenly included in I.M.'s proposed class schedule.  (See id.) The IHO acknowledged the apparent error; "nonetheless he found this resulted in a denial of a FAPE."  (Id. (citing IHO Decision at 21-22).)  As such, "the IHO's finding on this issue was an improper conclusion based on speculation that the [School D]istrict would not have adhered to the May 2021 IEP."  (Id. (collecting cases).)  Having reviewed the record, this Court agrees; the IHO's APE determination is untenable.

vi.   <u>Goals Development</u>

The IHO provided a summary of what transpired in developing I.M.'s goals for the 2021-2022 school year.  (<u>See</u> IHO Decision at 22-23.)  He highlighted the CSE chairperson read and adjusted each of the goals and that VSS staff provided feedback regarding the proposed goals.  (<u>See id.</u>)  He also stated there was testimony, <u>inter alia</u>, "that some of the VSS points of disagreements [regarding I.M.'s having mastered certain goals] were vocalized by the VSS meeting participants <u>among themselves</u> while they remotely participated <u>and were not shared with the CSE</u> at that time."  (<u>Id.</u> at 23.)  Thus, while the IHO found both the VSS and School District witnesses credible, he "reconcile[d] the testimony in favor of the [School D]istrict" since the goals were in accordance with the then-known information before the CSE.  (<u>Id.</u>)

Highlighting Parent's failure to identify the alleged Mastered Goals and Parent's improper citation of a single page from the IHO Hearing transcript, which referred to the Disputed Goals purportedly mastered by I.M. (<u>see</u> <u>supra</u> at 24; SRO Decision at 22, and note 12[10]), the SRO painstakingly summarized the relevant

_____

[10]   The SRO also noted Parent improperly raised other alleged inappropriate goals for I.M. in a memorandum of law and explained such "incorporation by reference is specifically prohibited by the [IDEA] practice regulations."  (SRO Decision at 22 n.12 (citing 8 N.Y.C.R.R. § 279.8[b]).)

testimony regarding the proposed goals for I.M., focusing on several motor skills goals, which goals were numbered in the 20s. (See id. at 23.)  Similar to the IHO, the SRO determined it was "unclear from the occupational therapist's testimony when the [S]tudent mastered the May 2021 IEP annual goals numbered 22, 23, and 24, and there is no indication in the hearing record that the occupational therapist objected to these goals at the time of the May 2021 CSE meeting."  (Id. at 24.)  Recognizing a CSE is to design annual goals which are achievable within the timeframe an IEP is in effect, the SRO determined:

> in this instance even if the [S]tudent had mastered some of the annual goals included on the May 2021 IEP, the inclusion of those annual goals does not rise to the level of denying the [S]tudent a FAPE, as the goals that are being complained of are limited to addressing the [S]tudent's motor skills, there are additional appropriate goals that also address motor skills, and an IEP does not need to identify annual goals as the vehicle for addressing each and every need in order to conclude that the IEP offered the student a FAPE.

(Id.)  Therefore, he found "no basis in the hearing record to disturb the IHO's finding that the [S]tudent's annual goals were appropriate."  (Id.)  The Court concurs.  "Since the SRO's decision and reasoning is supported by the record, h[is] decision in this regard deserves deference."  GB, 145 F. Supp. 3d at 251.

Plaintiff's argument regarding the development of I.M.'s goals fails to persuade the Court otherwise.  (See Support Memo at

22.)  Without identifying them, Parent simply claims the proposed

goals were either already mastered or too advanced.  (See id.)

She also asserts the School District failed to sustain its burden

of proving its proposed goals were appropriate (see id.); but,

Parent's position is not meaningfully developed and, in any event,

belied by the record, as meticulously recounted by the SRO.  "[T]he

sufficiency of goals and strategies in an IEP is precisely the

type of issue upon which the IDEA requires deference to the

expertise of the administrative Officers."  GB, 145 F. Supp. 3d at

249 (quoting Grim, 346 F.3d at 382)).  This Court does so here.

### 2.   Further Consideration of the *Burlington/Carter* Test

> Based upon the foregoing, the SRO
> correctly held that [I.M]'s IEP[] w[as] both
> procedurally and substantively adequate.  As
> the [School] District provided a FAPE for
> [I.M.] during the 20[21]-[22] . . . school
> year[], the Court need not consider the second
> and third prongs of the Burlington/Carter
> test. Therefore, Plaintiff['s] motion for
> summary judgment is denied . . . .

F.L., 274 F. Supp. 3d at 125; aff'd, 735 F. App'x at 41 ("Because

we defer to the SRO's decision on prong one of the

Burlington/Carter test, we do not need to address the remaining

two prongs.").


[Remainder of page intentionally left blank.]

<u>CONCLUSION</u>

Accordingly, **IT IS HEREBY ORDERED** that Plaintiff's Summary Judgment Motion (ECF No. 81) is DENIED; the SRO Decision is affirmed, and Plaintiff's Complaint is dismissed. Judgment shall enter in favor of Defendant. Once Judgment has entered, the Clerk of Court is directed to CLOSE this case.


**SO ORDERED.**

                    /s/ JOANNA SEYBERT
                    JOANNA SEYBERT, U.S.D.J

Dated:     March 28, 2025
           Central Islip, New York